# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) | |
| v. | ) ) | Criminal Action No. 10-320 (RMC) |
| THOMAS ANDERSON BOWDOIN, JR., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Defendant Thomas A. Bowdoin, Jr., moves to dismiss the criminal indictment against him due to alleged statutory vagueness defining the alleged crime and because his company, AdSurfDaily, Inc. ("ASD"), did not deal in "investment contract" securities, as defined in *SEC v. W.H. Howey Co.*, 328 U.S. 293 (1946). Because the motion is without merit, it will be denied.

## I. FACTS

The Indictment charges Mr. Bowdoin with engaging in the unlawful sale of unregistered securities and the use of fraud and material misrepresentations over interstate wire communications, in the commission of: (1) Wire Fraud, 18 U.S.C. § 1343; (2) Securities Fraud, 15 U.S.C. §§ 78j(b) and 78ff; (3) Aiding and Abetting and Causing An Act to Be Done, 18 U.S.C. § 2; and (4) the Unlawful Sale of Unregistered Securities, 15 U.S.C. §§ 77e(a)(2) and 77x. Indictment [Dkt. #3].

In earlier civil forfeiture litigation, ASD described itself as a multi-level marketing company that offered online advertising. *United States v. 8 Gilcrease Lane*, Civ. No. 08-1345

(RMC), Emergency Mot. for Return of Seized Funds [Dkt. # 7] at 12. It operated over the Internet (thereby engaging in transmissions by wire) at www.asdcashgenerator.com and through a related company, La Fuente Dinero, at www.lafuentedinero.com. According to these sites, ASD advertisers/members could earn large profits by (1) paying fees to advertise their own webpages, (2) earning rebates by surfing other advertisers' webpages on the ASD "rotator," and (3) earning commissions by recruiting more advertisers to do the same. *See id.*, Compl. [Dkt. #1] ¶ 15. ASD promoted its advertising program by offering advertisers a rebate of up to 125% on their advertising costs. The Government alleged that ASD did not sell any products or services sufficient to generate the income stream needed to support the rebates and commissions that it promised to pay its advertisers. *Id.* ¶ 17.

ASD sold "ad packages," whereby an advertiser's webpage appeared on a "rotator" for view by other advertisers. ASD paid its advertisers a rebate to view a minimum number of websites each day, thereby insuring that prospects would be viewing each site. In other words, ASD *sold* "ad packages" to advertisers and *paid* the advertisers to look at the webpages of other ASD advertisers. ASD also paid its advertisers commissions on personal sales of ad packages for referring other advertisers to ASD and, if they became "members" by paying a monthly fee, ASD paid higher commissions to the referring "member" on personal sales as well as referral commissions on second level sales, *i.e.*, sales by a person whom the member had referred.

The Indictment alleges that Mr. Bowdoin perpetrated a scheme to defraud the members of ASD. Specifically, it alleges that Mr. Bowdoin solicited prospective customers to ASD based upon, among other things, his promise to use their funds to operate what was represented to be a profitable Internet advertising company capable of providing high returns on the funds they paid

to ASD. Over the course of two years, Mr. Bowdoin is alleged to have made numerous misrepresentations and omissions in order to raise funds including: claiming to be operating a legitimate Internet advertising company; asserting that ASD had independent revenue to pay members the returns promised; representing that Mr. Bowdoin's only run-in with law enforcement consisted of a traffic ticket, when he had been convicted already of criminal securities violations; representing that the revenue methodology and numbers ASD published in support of its payouts were true and accurate, when ASD was really managing its revenue to ensure that it only paid out about one percent (1%) of a member's investment each weekday and one-half a percent (.5%) on the weekends; representing that ASD was not required to register with the United States Securities and Exchange Commission (SEC); and representing that Mr. Bowdoin was operating ASD in a far different manner than that which he followed. Indictment ¶ 28.

> In moving to dismiss the Indictment, Mr. Bowdoin argues:
>
> 1. Counts One through Seven of the Indictment, as well as the criminal forfeiture . . . must be dismissed because the statute defining what constitutes a [SEC] regulated "security" is unconstitutionally vague as applied to [Mr.] Bowdoin, and therefore violates the Defendant's due process rights under the Fifth Amendment.
>
> 2. The statute defining what are SEC-regulated securities is void for vagueness as applied to [Mr.] Bowdoin because it fails to provide adequate notice of the proscribed conduct, and it lends itself to arbitrary and discriminatory enforcement.
>
> 3. Alternately [sic], Counts One through Seven of the Indictment, as well as the criminal forfeiture . . . must be dismissed because the ad-surf business model employed by AdSurfDaily, Inc. and [Mr.] Bowdoin's related businesses, as alleged in the indictment, cannot constitute an SEC-regulated "investment contract" security as defined under the three-prong test established by the *Howey* . . . .

Def.'s Mot. to Dismiss [Dkt. # 19] ¶¶ 6–8.

## II. STANDARD OF REVIEW

A motion to dismiss an indictment challenges the adequacy of an Indictment on its face. Thus, the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings. *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986); *United States v. Morgan Drive Away, Inc.*, Crim. No. 697-73, 1974 WL 830, *1 (D.D.C. Jan. 24, 1974). The question, then, is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *United States v. Sampson*, 371 U.S. 75, 76 (1962).

## III. ANALYSIS

Mr. Bowdoin argues that the phrase "investment contract" is an "amorphous descriptor utilized by prosecutors to characterize a bewildering variety of transactions as 'securities;'" that the "shifting nature of this vague descriptor" is "often only resolved by judicial analysis at trial;" and that he faces a loss of liberty and property "at this Court's potential ad hoc determination that the ad-surf business model is a regulated 'investment contract' — a determination never available to [Mr.] Bowdoin prior to his indictment." Def.'s Mem. in Support of Mot. to Dismiss [Dkt. # 19] ("Def.'s Mem.") at 3-5.

As detailed above, Mr. Bowdoin advances three possible attacks on the Indictment. Each is described at times as an "as applied" challenge and at other times as a facial challenge to the statute. In his brief, however, Mr. Bowdoin offers *no argument* to support his "as applied" challenge and the Court will ignore the pretense that he makes one.[1] Instead, the Court will address what Mr.

---

[1] Despite repeated references to the statute or the term "investment contract" as being vague "as applied," Mr. Bowdoin provides no analysis and the argument is deemed conceded.

Bowdoin's brief actually argues: whether the definition of an SEC-regulated "investment contract" is unconstitutionally vague; and whether the "ad-surf business model simply cannot meet" the three-prong test for an "investment contract" under *Howey*, 328 U.S. 293.

**A. The Term "Investment Contract" Is Not Unconstitutionally Vague on Its Face**

The definition of a "security" subject to registration with the SEC is provided at 15 U.S.C. § 77b(a)(1), which is the place to start the analysis. It states:

> The term "security" means any note, stock, treasury stock, security future bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1) (emphasis added). An "investment contract" properly defined constitutes a "security." *Howey* wrestled with the meaning of the term. The Supreme Court noted that it came from State laws adopted before the federal statute and "had been broadly construed by state courts so as to afford the investing public a full measure of protection." 318 U.S. at 298.

> Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N.W. 937, 938. This definition was uniformly applied by state courts to a

> variety of situations where individuals were led to invest money in a
> common enterprise with the expectation that they would earn a profit
> solely through the efforts of the promoter or of someone other than
> themselves.

*Id.* (footnote omitted). "By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystalized by this prior judicial interpretation." *Id.*[2] When profits were dependent chiefly upon the efforts of the investor himself, however, no investment contract-type security has been found. *See, e.g.*, *State v. Heath*, 153 S.E. 855, 858 (N.C. 1930).

Based on this history in State courts, the Supreme Court held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." *Howey*, 318 U.S. at 299. The benefits to the Court's definition were many: 1) it had "been enunciated and applied many times by lower federal courts"; 2) it permitted "the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security'"; and 3) it provided "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable *schemes devised by those who seek the use of the money of others on the promise of profits.*" 328 U.S. at 299 (emphasis added).

Just in case its point was lost, the Court concluded that:

---

[2] *See Stevens v. Liberty Packing Corp.*, 161 A. 193, 194 (N.J. Ch. 1932) (cited in *Howey*, 318 U.S. 298 n.4) (in a securities fraud involved with raising rabbits for meat and pelts, the court noted that "[t]he guaranty of 32 per cent. income per annum alone marks the fraud. It reads like Ponzi's lure. If rabbit raising by the company warranted the guaranty, why, at all, let the victim in on the profit? Why share it?").

> [A]ll the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed.

*Id.* at 300. The Court reached the conclusion that the Securities Act was violated even though the failure to abide by the law "resulted from a bona fide mistake as to the law." *Id.* "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value." *Id.* at 301.

Three years before *Howey*, the Supreme Court grappled with alleged vagueness of the Securities Act in *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943). That case dealt with the SEC's civil enforcement of the Securities Act against the sellers of investment contract securities. The Supreme Court noted the 1820 comments of Chief Justice Marshall that "though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature." *Id.* at 354 (quoting *United States v. Wiltberger*, 5 Wheat. 76, 95 (1820)); *see also United States v. Hartwell* 6 Wall. 385, 396 (1867) ("the words [of a statute] should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent.") In accordance with this basic principle, the Court held that "[i]n the present case we do nothing to the words of the Act; we merely accept them. It would be necessary in any case for any kind of relief to prove that documents being sold were securities under the Act," whether by proof within a document or proof outside the instrument. *Id.* The only difference between civil and criminal cases

with regard to the proof required to find that documents were sold as "securities" is the level of proof — in a criminal case the proof must be beyond a reasonable doubt. *Id.* Forecasting the decision in *Howey*, the Court explained that substance rules over form:

> In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be.

320 U.S. at 352.

The flexible principle set forth in *Howey* has guided courts since 1946. Mr. Bowdoin now asserts that it is insufficient to save the statutory text from being unconstitutionally vague. Mr. Bowdoin argues that "the *Howey* test itself is over-broad and subject to subjective analysis, thereby rendering it virtually impossible for individuals to ascertain whether certain transactions are prohibited absent SEC securities regulation oversight." Def.'s Mem. at 8. He continues, "because it is far from clear how to uniformly apply the *Howey* test to novel fact patterns . . . [,] the SEC listing of an 'investment contract' as a regulated 'security' is unconstitutionally vague," violates Mr. Bowdoin's due process rights under the Fifth Amendment, and requires that all counts against him be dismissed. *Id.*

The Court cannot oblige. *Howey* binds the Court and, inasmuch as the Supreme Court *in 1946* found the Securities Act, and specifically its use of the term "investment contract," not to be so vague as to prevent enforcement, this Court is not free to substitute its own judgment. Congress defined securities to include "investment contracts" based upon multiple years of enforcement of that term by various States under state laws. The lineage of the term is too long and

well-recognized for Mr. Bowdoin's 2011 claim of unconstitutional vagueness to stand. Mr. Bowdoin's attack on the facial vagueness of the term "investment contract" as a type of security covered by the Securities Act is without merit.

Even were *Howey* not dispositive, the Court would deny Mr. Bowdoin's motion to find the Securities Act too vague for constitutional enforcement. When the interpretation of a statute does not implicate First Amendment rights, a vagueness challenge will be assessed only as the statute has been applied, *i.e.*, "in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993)). There is a "strong presumpt[ion] of validity that attaches to an Act of Congress." *United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). Therefore, a court construes congressional enactments as constitutional whenever possible. *Skilling v. United States*, 130 S. Ct. 2896, 2928 (2010). It would be more than passing strange to conclude in 2011 that the Securities Act, passed decades ago and enforced thousands of times in the interim, is invalid because of facial vagueness and the Court finds no reason to do so.

**B. The Auto-Surf Business Model, As Alleged in the Indictment, Could Constitute the Sale of Investment Contract Securities**

Mr. Bowdoin argues that AdSurfDaily did not sell investment contract securities because its operations met none of the three prongs of the test established in *Howey*, *i.e.*, "whereby a person [1] invests his money in a common enterprise and [2] is led to expect profits [3] solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 299. In analyzing his argument, the Court follows the direction of the Supreme Court to apply the test "in light of the substance — the economic realities of the transaction — rather than the names that may have been employed by

the parties." *Nat'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979) (internal quotations and citations omitted).[3]

### 1. Investment of Money

"Investment" is defined as when a person "places his money at risk in anticipation of a profit[.]" *SEC v. Diversified Indus., Inc.*, 465 F. Supp. 104, 108 (D.D.C. 1979). Mr. Bowdoin argues that "[t]his prong is certainly not satisfied" because the ASD advertisers "paid funds to purchase temporary space on the AdSurfDaily internet advertising rotator — this constitutes consumption of a service and payment therefore." Def.'s Mem. at 11. Thus, his argument continues:

> [T]he sole payments that AdSurfDaily consumers expected back to them were the rebates paid to purchasing advertisers for the service of viewing other members' websites in the rotator, and possible percentage-based referral commissions for recommending other advertisers to the site. Neither payment constitutes return on an "investment." There was no money at risk — only completed payments made to buy time on the advertisement rotator, discrete payments made by the company to advertisers who performed the service of viewing advertisements on the rotator, and payment of referral commissions, wholly independent of any alleged "investment" in AdSurfDaily.

*Id.* at 12. Direct statements from ASD seemingly contradict this defense and point to an investment scheme:

> I want to congratulate you on your positive decision to join this exciting business for free today so you can *improve your financial situation, start earning money now with this income earning opportunity*.
>
> You are now joining many thousands of other Ad Cash Generator members that are just like you who are on this adventure and journey

---

[3] Mr. Bowdoin did not provide evidence through affidavits or otherwise as to how ASD actually operated — or any other basis — from which the Court could draw legal conclusions on whether ASD operations met the *Howey* test.

> for *financial freedom*. . . .
>
> Well, I'm here in my office making this video with the purpose to help you *get started earning money* with our ad cash generator program. So in order to accomplish this purpose I want to get right down to business and speak to you as a professional and successful businessman.

Gov't Opp'n [Dkt. # 23], Ex. 1 (Tr. of "New Member Success Video" dated 3/16/08) at 1. In addition, ASD's promotions on its own website stated that "[a]dvertisers will be paid rebates until they receive 125% of their ad packages." *See id.*, Ex. 2 (ASD Terms and Conditions). The Indictment alleges that Mr. Bowdoin hosted rallies across the country to encourage new members to join ASD. Indictment ¶¶ 22-23. For prospective members who did not have a business to advertise, Mr. Bowdoin provided them with a choice of two websites to join and "advertise" on ASD's rotator. *Id.* ¶ 25.

Contrary to Mr. Bowdoin's characterization of the ASD business, ASD's promise to pay back 125% of the value paid to ASD by an advertiser strongly indicates that the joining of ASD via the purchase of an "advertisement" on the rotator in fact constituted an "investment" for a financial return. According to the government, the return on investment was based on the dollar value of money paid by a member to ASD and not the number of advertisements s/he viewed. Gov't Opp'n at 12. This practice would separate payments to ASD members from "the service of viewing advertisements on the rotator" and, again, these alleged facts smack of an investment. Indeed, the government proffers that Mr. Bowdoin awarded ad packages to employees in the way that an employer awards bonuses. It argues that Mr. "Bowdoin and the employees of ASK treated the 'ad packages' as shares from which they could expect to earn returns." Gov't Opp'n at 12. Moreover, members did not have to have an ongoing business to advertise; they could join ASD anyhow.

Indictment ¶ 25. Based on the allegations set forth in the Indictment, the evidence already before the Court, and the government's proffers of expected trial evidence, the Court finds that the allegations, if proven, would be sufficient to permit a jury to find that ASD members were investing. *See Sampson*, 371 U.S. at 76.

### 2. Common Enterprise

The parties agree that the Court should evaluate the alleged common enterprise, the second element of the definition of "investment contract" security, by determining whether the government has made a showing of "horizontal commonality, which requires that there be a 'pooling of investment funds, shared profits, and shared losses.'" *SEC v. Banner Fund Intern.*, 211 F.3d 602, 614 (D.C. Cir. 2000) (internal citations omitted).

Mr. Bowdoin contends that "[t]he discrete advertising package purchase payments [made by ASD members to advertise on the Internet rotator] simply do not constitute the requisite 'pooling' of 'investor' funds, so as to employ these pooled funds to grow the balance, so as to generate income for the payors." Def.'s Mem. at 13. In contrast to Mr. Bowdoin's argument, ASD's own website provided a different perspective:

> Rebate Distribution: Ad purchase sales and banner ad sales on the Cash Generator and the sale of ebooks will be totaled at midnight each night and 50% of the gross sales will be rebated to add purchasers. Fifty percent of the commissions that the Cash Generator earns from their sister site, "Attract Marketing System," will also be paid as rebates to ad purchasers on the Cash Generator.
>
> Every night at midnight the number of eligible ad packages will be totaled and divided into the total ad package sales, banner ad sales and ebook sales to determine the amount of the rebate for each ad package. That amount will be multiplied by the number of ad packages in each advertiser's account and the total will be credited to his/her cash balance account. Rebates will show up in your account

after midnight EST.

Gov't Opp'n, Ex.3 (ASD Website) at 1. Thus, "it was ASD's stated policy to take the money it received each day and divide those funds among all the investors who met the nominal 'surfing' requirement." Gov't Opp'n at 13-14. The Indictment alleges that ASD paid out approximately $31 million to early members and that more than 98% of that money came from monies paid to ASD by other members, not from banner ad sales, ebooks or any other source. Indictment ¶ 3. Totaling each day's ad packages and dividing them into the number of ad package sales to determine the rebate for each ad package, as ASD told its members it did, would constitute a pooling of funds and a sharing of profits.

The allegations set forth in the Indictment, together with the evidence already before the Court and the government's proffers, are sufficient, if proven, to permit a jury to find that there was a pooling of investment funds, shared profits, and shared losses. *See Sampson*, 371 U.S. at 76.

### 3. Depends on the Efforts of Others

"This court has repeatedly treated [the *Howey*] test as met when profits are generated 'predominantly' from the efforts of others." *Liberty Property Trust v. Republic Props. Corp.*, 577 F.3d 335, 339 (D.C. Cir. 2009) (internal quotations and citations omitted). *See also SEC v. Life Partners, Inc.*, 87 F.3d 536, 547 (D.C. Cir. 1996) ("If the investor's profits depend . . . predominately upon the promoter's efforts, then the investor may benefit from the disclosure . . . requirements of the federal securities laws."). Mr. Bowdoin argues that ASD members "purchased a valuable service," to wit: "the ability to have their business webpages viewed by thousands of people per day." Def.'s Mem. at 15. He argues further that since ASD members had to perform this service to be entitled to rebates, their duties were not "'nominal or limited'" and had a "'direct effect upon

receipt by the participant of the benefit promised by the promoters.'" Def.'s Mem. at 18 (quoting *Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 153 (3d Cir. 1997)).

The allegations of the Indictment and the evidence before the Court severely undercut Mr. Bowdoin's argument. First, ASD told its participants/members that it totaled the new ad packages sold each day and divided at least 50% of that sum to pre-existing members. Gov't Opp'n, Ex. 3 (ASD Website) at 1. Such members could receive rebates without regard to whether they spent time viewing others' ads, such as when the ASD site was down and no one could view any advertisements, *see* Gov't Opp'n at 15, and without regard to whether any of the ads they viewed were selling an actual product because ASD providing "dummy" websites for those who wanted to participate but had no product to sell. *See* Indictment ¶ 25. Second, ASD *paid out* greater returns to those members who *paid in* greater sums each month, without regard to its alleged advertising business. *See* Gov't Opp'n, Ex. 4 (ASD Frequently Asked Questions # 16) ("How many web sites to I have to view in order to earn rebates? If you do not pay a membership fee you must surf 24 sites daily to earn rebates. If you pay a $10.00 monthly membership fee you must surf 24 sites daily. If you pay a $25.00 monthly membership fee you only have to surf 18 sites daily. If you pay a $100.00 monthly membership fee you only have to surf 12 sites daily. Each site must be viewed for 15 seconds."). In sum, the allegations set forth in the Indictment together with the evidence already before the Court and the Government's proffers, if proven, are sufficient to permit a jury to find that ASD members were paid based on the efforts of others. *See Sampson*, 371 U.S. at 76.

### IV. CONCLUSION

The Indictment alleges that Mr. Bowdoin knows precisely how to couch his words in an attempt to evade the law. *See* Indictment ¶ 13 (Mr. Bowdoin sent an email stating "[l]et's don't

[sic] use the words investment and returns. Instead, lets [sic] use ad sales and surfing commissions. The Attorney Generals in the U.S. don't like for us to use these words in our program."). His motion to dismiss the Indictment ignores the teaching of the Supreme Court — that courts should examine the substance, not form, of a transaction and evaluate its economic reality. *Howey*, 328 U.S. at 298. Through the development of State laws, "[a]n investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" *Id.* This Court cannot find, as a matter of law, that the Indictment fails to allege crimes here.

Defendant's motion to dismiss the Indictment [Dkt. # 19] will be denied without prejudice. A memorializing Order accompanies this Memorandum Opinion.


Date: March 18, 2011                                    /s/
                                                   ROSEMARY M. COLLYER
                                                   United States District Judge