

U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

April 17, 2012

Charles A. Murray, Esq.
27911 Crown Lake Blvd., Suite 223
Bonita Springs, Florida 34135

**Re:    United States v. Thomas Anderson Bowdoin, Jr., Crim No. 10-320 (RMC)**
          **Government's First Notice Pursuant to Fed. R. Evid. 404(b)**

Dear Mr. Murray:

We write to provide notice that the government intends to introduce evidence of uncharged misconduct against your client at trial in United States v. Thomas Anderson Bowdoin, Jr., Crim No. 10-320 (RMC). The evidence the government seeks to introduce relates to the following four areas:

1.    Misstatements and Omissions of Material Facts;

2.    Golden Panda;

3.    Ad View Global; and

4.    One X.

The government submits, in the first instance, that the evidence relating to all four areas constitutes direct evidence of the crimes charged in the indictment; therefore, Federal Rule of Evidence 404(b) notice is not required. To the extent the Court declines to admit the evidence as direct evidence of the charged offenses, the government submits that the evidence it seeks to introduce is inextricably intertwined with the charged offenses. Thus, again, Fed. R. Evid. 404(b) notice is not required because the evidence the government seeks to introduce is part of, and facilitated, the charged offenses. If the Court declines to admit the evidence described below on either of these two bases, the government intends to introduce the evidence under Fed. R. Evid. 404(b), as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or other such proper purpose. Thus, the government hereby gives notice that it also intends to introduce the evidence described below pursuant to Fed. R. Evid. 404(b).

## I.    MISSTATEMENTS AND OMISSIONS OF MATERIAL FACTS

The government intends to introduce evidence that Thomas Anderson Bowdoin, Jr. ("Bowdoin") misstated and failed to disclose certain material facts to ASD investors during the course of the scheme to defraud alleged in the indictment (note: hereinafter, ASD collectively refers to Ad Surf Daily, Ad Cash Generator and La Fuente Dinero, as described in the indictment). These facts would have been important to the mix of information available to ASD investors at the time they were deciding whether to invest in ASD.

### A.    Criminal Matters

Bowdoin repeatedly represented to ASD investors through ASD employees that his only contact with the criminal justice system was a speeding ticket in Georgia. That representation was false and misleading. In the 1990s, Bowdoin was indicted in at least four criminal securities fraud cases in Alabama: 1) CC-96-1142, in Montgomery County, Alabama; 2) CC-96-1143, in Montgomery County, Alabama; 3) CC-96-1144, in Montgomery County, Alabama; and 4) CC-97-75, in Wilcox County, Alabama. The indictments relating to those four cases are attached hereto as Exhibits 1, 2, 3 and 4, respectively. Bowdoin ultimately pled guilty to certain charges contained in the indictments. A copy of the plea agreement is attached hereto as Exhibit 5.

Pursuant to the plea agreement, Bowdoin agreed that he would be permanently barred from engaging in the securities industry in the State of Alabama. Bowdoin was also ordered to pay restitution to the victims in the Alabama cases. At the time the events that form the basis for the instant indictment were ongoing, Bowdoin had not fulfilled his restitution obligation. Indeed, Bowdoin used proceeds of the scheme charged in the instant indictment to pay a portion of the restitution order in the Alabama cases.

The government is aware of additional criminal matters lodged against Bowdoin. We are currently in the process of collecting materials relating to those matters and expect to provide additional notice and documents in the near future.

### B.    Civil Proceedings

The government is aware of civil proceedings brought against Bowdoin and/or his companies by federal regulators, state regulators and/or private litigants, as well as a bankruptcy filing by Bowdoin. We are currently in the process of collecting materials relating to those matters and expect to provide additional notice and documents in the near future.

C.    Bowdoin's Representations relating to His Business Successes

While promoting ASD, Bowdoin repeatedly told ASD investors that he was a successful businessman, identifying several examples of his prior business endeavors. Those representations were false and misleading. For example, Bowdoin claimed that he ran successful dry cleaning, mobile phone and GPS tracking businesses. The government intends to introduce evidence that those businesses were not successful and on several occasions were the subject of civil and criminal proceedings. The government is currently collecting materials relating to those matters and expects to produce additional notice and documents in the near future.

## II.    **GOLDEN PANDA AD BUILDER**

Beginning in or around May 2008, Bowdoin, Clarence Busby ("Busby") and others began operating a Chinese version of ASD over the internet at goldenpandaadbuilder.com. Golden Panda Ad Builder's Terms of Service mirrored ASD's Terms of Service in virtually all material respects. A copy of Golden Panda Ad Builder's Terms of Service are attached hereto as Exhibit 6. Similar to ASD, Golden Panda Ad Builder offered two income streams to Golden Panda Ad Builder investors. First, investors were told that they could purportedly earn up to 125% of their investment in Golden Panda Ad Builder by viewing other investors' web sites on the Golden Panda Ad Builder advertising rotator. Second, investors were told that they could earn commissions by bringing new investors into the program.

Similar to ASD, the promised opportunity to earn up to 125% of the money invested in Golden Panda Ad Builder was illusory. While a proportionally small percentage of investors may have earned up to 125% of the money they invested based on money contributed by new members, the vast majority of investors never had the opportunity to earn 125% of the money they invested in the program. And, the number of investors who never had the opportunity to earn up to 125% of their investment exponentially increased as the program increased in size.

Critically, like ASD, Golden Panda Ad Builder did not have any significant independent revenue to fund the 125% opportunity presented to investors. Golden Panda Ad Builder also did not generate income by selling products to consumers outside the program. Rather, it simply redistributed funds among investors. When the addition of new members stopped, the program would have ceased to exist. In an effort to build Golden Panda Ad Builder's investment pool, Golden Panda Ad Builder targeted individuals who previously invested in ASD, and many Golden Panda Ad Builder investors previously invested in ASD.

3

After Golden Panda's inception, ASD employees learned that Busby had previously been sanctioned for violating the securities laws. In the late 1990s, the Securities and Exchange Commission found that Busby violated the antifraud provisions of the securities laws by offering and selling investment contracts in connection with three different prime bank schemes. ASD employees informed Bowdoin of what they had learned about Busby. Bowdoin subsequently severed ties with Busby and Golden Panda Ad Builder because he did not want ASD or himself associated with someone with Busby's history. Bowdoin believed that any association with Busby or Golden Panda Ad Builder could be detrimental to ASD's business.

## III.   AD VIEW GLOBAL

After the United States Secret Service seized ASD's bank accounts in August 2008, Bowdoin, Gary Talbert ("Talbert") and others began operating another version of ASD over the internet at adviewglobal.com ("AVG"). Ad View Global's Terms of Service mirrored ASD's Terms of Service in many material respects. A copy of AVG's Terms of Service is attached hereto as Exhibit 7. While some of the terms in AVG's program were different than ASD, the core business model remained the same. AVG still offered investors two income streams: First, investors were told they could earn returns on their investments for 150 days by viewing other investors' web sites on the AVG advertising rotator. Second, investors were told that they could earn commissions by bringing new investors into the program. In 2009, AVG ceased operation when allegations arose that an individual associated with AVG purportedly stole money from AVG.

## IV.   ONE X

From in or around 2011 and continuing through the present, Bowdoin has participated in, and promoted, a fraudulent scheme involving a program called "OneX." On internet websites, conference calls, and webinars, Bowdoin advertised OneX as an exclusive "money-making opportunity," and claimed for an initial investment of as low as $5 and almost no work, participants can earn $99,460, or more in several months. Like the claims made in connection with ASD, this claim is inherently deceptive because the ability to earn money through the OneX program is dependent upon the recruitment of new participants, and the vast majority of people who join OneX will not earn the advertised amount.

Participants in OneX earn money through commissions, which are generated when the participant recruits a new member, who is forced to purchase "lessons" (as well as the re-sale rights for those lessons) when they join the program, and at later points along the way. All participants in OneX are placed into what the company refers to as a "matrix," but the organizational structure more accurately is described as a pyramid. Specifically, new recruits are placed in a row beneath their sponsor, and become part of the sponsor's "downline." Individuals who are at a level above a participant (e.g., the new recruit's sponsor), are in that participant's "upline."

A member can recruit and "sponsor" a new participant by purchasing a "key" for $6. The "key," which expires after eight hours, allows the new recruit to join OneX. When the new member joins, $5 (out of the sponsor's initial $6 investment) is placed in the new member's account. At the same time, however, the program automatically purchases "Lesson 1" on behalf of the new member, and does so by debiting $5 from the new member's account. The purchase of this lesson generates a commission for participants in the member's upline. The price of the lessons progressively increases from $5 to more than $600, and members' accounts are automatically debited to purchase these lessons as additional recruits are added to their downlines. Each automatic lesson purchase creates a commission for participants in the purchaser's upline.

The "lessons" that participants purchase consist of a series of short ebooks on subjects such as growing a business, sales, and marketing. Examples of these "lessons" include a 21-page document titled "Celebrate Exploding Your Business and Your Bank Account with Valuable Education: Learn One-Time but Use for a Lifetime" and "Desperate Market Domination," an 18-page document that provides advice on how to identify and target "desperate markets."[1] The "lessons," along with the "resale rights" to those lessons are the only product that OneX sells.

Like ASD, OneX does not generate income by selling a product to consumers outside the system. Instead, it simply re-distributes funds among participants. Thus, a participant will not earn money unless he or she recruits new members. When the addition of new members stops, the program ceases to exist.

In this latest venture, Bowdoin has again partnered with Tari Steward and Rayda Roundy, both of whom were involved in the operation of ASD. Additionally, in promoting OneX, Bowdoin is once again targeting individuals who invested in ASD. For example, on conference calls promoting OneX, Bowdoin promises to provide participants with "leads," or email addresses that they can contact in an effort to recruit new members, and thereby grow their downlines. Among the leads he provides are the email addresses of former ASD investors.

---

[1] The unidentified author of this "lesson" provides examples of search terms a seller could use to identify "desperate markets," including: morning sickness, excessive sweating, debt consolidation, work at home, quit smoking, and marriage repair. The advice includes: "When people have problems like these that they are desperate to get rid of, they are willing to spend almost any amount of money if they believe a product is a solution to their problem."

Bowdoin refers to OneX as a "gift from God," and explains that the program will help him raise money to fund his legal defense for this criminal case. Bowdoin assures listeners that when he prevails at trial, ASD will be back and business, and he will offer people the opportunity to re-invest with ASD or recoup the investment they made in ASD.

Sincerely,

Seth B. Waxman
Allison Barlotta
Assistant United States Attorneys
United States Attorneys Office for the
        District of Columbia
555 4th Street, NW, Washington, DC 20530

TAB 1

Grand Jury No. _335_

THE STATE of ALABAMA, )
    **Montgomery County.**      )     CIRCUIT COURT OF MONTGOMERY COUNTY
                                                   _____April_____ Session, 1996

## COUNT _1_

The Grand Jury of said County charge that before the finding of this Indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is otherwise unknown to this Grand Jury, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, without first having been registered as an Agent in the offices of the Alabama Securities Commission, sell within Montgomery County, State of Alabama, securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, to **LEON D. HADLEY**, in violation of Section 8-6-3(a) of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT  2

The Grand Jury of said County charge that before the finding of this Indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is otherwise unknown to this Grand Jury, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, without first having been registered as an Agent in the offices of the Alabama Securities Commission, sell within Montgomery County, State of Alabama, securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** to **JILL A. HADLEY,** in violation of Section 8-6-3(a) of the <u>Code of Alabama 1975,</u> against the peace and dignity of the State of Alabama .

## COUNT _3_

The Grand Jury of said County charge that before the finding of this Indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is otherwise unknown to this Grand Jury, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, without first having been registered as an Agent in the offices of the Alabama Securities Commission, sell within Montgomery County, State of Alabama, securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** to **SARA J. (HADLEY) BUFFTON,** in violation of Section 8-6-3(a) of the Code of Alabama 1975, against the peace and dignity of the State of Alabama .

## COUNT  4

The Grand Jury of said County charge that before the finding of this Indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is otherwise unknown to this Grand Jury, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, without first having been registered as an Agent in the offices of the Alabama Securities Commission, sell within Montgomery County, State of Alabama, securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** to **ANN W. BALL** in violation of Section 8-6-3(a) of the Code of Alabama 1975, against the peace and dignity of the State of Alabama .

## COUNT 5

The Grand Jury of said County charge that before the finding of this Indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is otherwise unknown to this Grand Jury, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, without first having been registered as an Agent in the offices of the Alabama Securities Commission, sell within Montgomery County, State of Alabama, securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, to **KENNETH A. CROSBY** in violation of Section 8-6-3(a) of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

*Ellen Brooks*
_____
**District Attorney, Fifteenth Judicial Circuit of Alabama**

TAB 2

Grand Jury No. _336_

**THE STATE of ALABAMA,** )
    **Montgomery County.**     )      CIRCUIT COURT OF MONTGOMERY COUNTY

~~April~~      ~~Session, 1996~~

### COUNT _1_

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, either directly or indirectly, make or cause to be made offers and/or sales of unregistered securities, to wit: shares of common stock, issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** within Montgomery County, State of Alabama, to **LEON D. HADLEY**, which said securities had not then been registered and recorded in the Register of the Alabama Securities Commission, in violation of Section 8-6-4, of the _Code of Alabama 1975,_ against the peace and dignity of the State of Alabama.

## COUNT _2_

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, either directly or indirectly, make or cause to be made offers and/or sales of unregistered securities, to wit: shares of common stock, issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, within Montgomery County, State of Alabama, to **JILL A. HADLEY**, which said securities had not then been registered and recorded in the Register of the Alabama Securities Commission, in violation of Section 8-6-4, of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 3

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, either directly or indirectly, make or cause to be made offers and/or sales of unregistered securities, to wit: shares of common stock, issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** within Montgomery County, State of Alabama, to **SARA J. (HADLEY) BUFFTON**, which said securities had not then been registered and recorded in the Register of the Alabama Securities Commission, in violation of Section 8-6-4, of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT _4_

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, either directly or indirectly, make or cause to be made offers and/or sales of unregistered securities, to wit: shares of common stock, issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** within Montgomery County, State of Alabama, to **ANN W. BALL,** which said securities had not then been registered and recorded in the Register of the Alabama Securities Commission, in violation of Section 8-6-4, of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.



## COUNT 5

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, did, within the last five years of this April Term of the 1996 Session of this Grand Jury, contrary to law, either directly or indirectly, make or cause to be made offers and/or sales of unregistered securities, to wit: shares of common stock, issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** within Montgomery County, State of Alabama, to **KENNETH A. CROSBY**, which said securities had not then been registered and recorded in the Register of the Alabama Securities Commission, in violation of Section 8-6-4, of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

_____

**District Attorney, Fifteenth Judicial Circuit of Alabama**

# TAB 3

Grand Jury No. *337*

**THE STATE of ALABAMA,** )
    **Montgomery County.**    )    CIRCUIT COURT OF MONTGOMERY COUNTY
                                          April          Session, 1996

### COUNT 1

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as, **ANDY BOWDOIN** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **LEON D. HADLEY** for the purpose of inducing **LEON D. HADLEY** to purchase said securities, that the funds invested would be used , in whole or part, to install a "company owned Mod-Spectrum" mobile telephone system in Atlanta, Georgia and said misrepresentation being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the <u>Code of Alabama 1975</u>, against the peace and dignity of the State of Alabama.

## COUNT 2

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as, **ANDY BOWDOIN** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **JILL A. HADLEY** for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that the funds invested would be used, in whole or part, to install a "company owned Mod-Spectrum" mobile telephone system in Atlanta, Georgia and said misrepresentation being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 3

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as, **ANDY BOWDOIN** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of a securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **SARA J. (HADLEY) BUFFTON** for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that the funds invested would be used, in whole or part, to install a "company owned Mod-Spectrum" mobile telephone system in Atlanta, Georgia and said misrepresentation being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 4

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as, **ANDY BOWDOIN** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **Ann W. Ball** for the purpose of inducing **ANN W. BALL** to purchase said securities, that the funds invested would be used , in whole or part, to install a "company owned Mod-Spectrum" mobile telephone system in Atlanta, Georgia and  said misrepresentation being material information for **ANN W. BALL** to consider in determining whether or not said  **ANN W. BALL** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975,  against the peace and dignity of the State of Alabama.

## COUNT 5

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as, **ANDY BOWDOIN** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **KENNETH A. CROSBY** for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that the funds invested would be used , in whole or part, to install a "company owned Mod-Spectrum" mobile telephone system in Atlanta, Georgia and  said misrepresentation being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975,  against the peace and dignity of the State of Alabama.

COUNT 6

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **LEON D. HADLEY** in writing, for the purpose of inducing **LEON D. HADLEY** to purchase said securities,    that there was virtually no limit to the number of customers that a **MOD-SPECTRUM** mobile telephone system could handle, said misrepresentation being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 7

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **JILL A. HADLEY** in writing, for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that there was virtually no limit to the number of customers that a **MOD-SPECTRUM** mobile telephone system could handle, said misrepresentation being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 8

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **SARA J. (HADLEY) BUFFTON** in writing, for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that there was virtually no limit to the number of customers that a **MOD-SPECTRUM** mobile telephone system could handle, said misrepresentation being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 9

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities, directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **ANN W. BALL** in writing, for the purpose of inducing **ANN W. BALL** to purchase said securities,

that there was virtually no limit to the number of customers that a **MOD-SPECTRUM** mobile telephone system could handle, said misrepresentation being material information for **ANN W. BALL** to consider in determining whether or not said **ANN W. BALL** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 10

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **KENNETH A. CROSBY** in writing, for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that there was virtually no limit to the number of customers that a **MOD-SPECTRUM** mobile telephone system could handle, said misrepresentation being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 11

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **LEON D. HADLEY** in an **ALL AMERICAN COMMUNICATIONS NETWORK, INC. CONFIDENTIAL SUMMARY INFORMATION STATEMENT**, for the purpose of inducing **LEON D. HADLEY** to purchase said securities,   that the company was not aware of any material pending or threatened litigation affecting the company or its assets,  said misrepresentation being material information for  **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 12

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **JILL A. HADLEY** in an **ALL AMERICAN COMMUNICATIONS NETWORK, INC. CONFIDENTIAL SUMMARY INFORMATION STATEMENT,** for the purpose of inducing **JILL A. HADLEY** to purchase said securities,   that the company was not aware of any material pending or threatened litigation affecting the company or its assets,   said misrepresentation being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the <u>Code of Alabama 1975,</u> against the peace and dignity of the State of Alabama.

## COUNT 13

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **SARA J. (HADLEY) BUFFTON** in an **ALL AMERICAN COMMUNICATIONS NETWORK, INC. CONFIDENTIAL SUMMARY INFORMATION STATEMENT**, for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that the company was not aware of any material pending or threatened litigation affecting the company or its assets, said misrepresentation being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 14

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **ANN W. BALL** in an **ALL AMERICAN COMMUNICATIONS NETWORK, INC. CONFIDENTIAL SUMMARY INFORMATION STATEMENT**, for the purpose of inducing **ANN W. BALL** to purchase said securities,   that the company was not aware of any material pending or threatened litigation affecting the company or its assets,   said misrepresentation being material information for **ANN W. BALL** to consider in determining whether or not said **ANN W. BALL** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 15

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **KENNETH A. CROSBY** in an **ALL AMERICAN COMMUNICATIONS NETWORK, INC. CONFIDENTIAL SUMMARY INFORMATION STATEMENT**, for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities,    that the company was not aware of any material pending or threatened litigation affecting the company or its assets,  said misrepresentation being material information for **KENNETH A. CROSBY** to consider in determining whether or not said   **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 16

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said securities, that **MOBILE INTERNATIONAL, INC.,** had developed the **MOD-SPECTRUM** mobile telephone service, which was a low cost alternative to cellular mobile telephone services and that the **MOD-SPECTRUM** system would be upgraded to a DIGITAL system, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 17

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **JILL A. HADLEY**, for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that **MOBILE INTERNATIONAL, INC.**, had developed the **MOD-SPECTRUM** mobile telephone service, which was a low cost alternative to cellular mobile telephone services and that the **MOD-SPECTRUM** system would be upgraded to a DIGITAL system, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 18

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **SARA J. (HADLEY) BUFFTON**, for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that **MOBILE INTERNATIONAL, INC.,** had developed the **MOD-SPECTRUM** mobile telephone service, which was a low cost alternative to cellular mobile telephone services and that the **MOD-SPECTRUM** system would be upgraded to a DIGITAL system, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 19

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **ANN W. BALL,** for the purpose of inducing **ANN W. BALL** to purchase said securities, that **MOBILE INTERNATIONAL, INC.,** had developed the **MOD-SPECTRUM** mobile telephone service, which was a low cost alternative to cellular mobile telephone services and that the **MOD-SPECTRUM** system would be upgraded to a DIGITAL system, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 20

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, make an untrue statement of material fact, when the said Defendant misrepresented to **KENNETH A. CROSBY**, for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that **MOBILE INTERNATIONAL, INC.**, had developed the **MOD-SPECTRUM** mobile telephone service, which was a low cost alternative to cellular mobile telephone services and that the **MOD-SPECTRUM** system would be upgraded to a DIGITAL system, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 21

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of a security, to wit: a **$600,000.00** Investment Contract in a **MOD SPECTRUM** mobile telephone tower system in the Atlanta, Georgia area, hereinafter referred to as a security, directly or indirectly,   make an untrue statement of material fact, when the said Defendant misrepresented to   **LEON D. HADLEY**, for the purpose of inducing **LEON D. HADLEY** to purchase said security,   that **MOD SPECTRUM** mobile telephone tower systems were under contruction in the Atlanta area and the investment of **LEON D. HADLEY** would be used to finish said construction,   within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 22

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of a security; to wit: a **$600,000.00** Investment Contract, in a **MOD SPECTRUM** mobile telephone tower system in the Atlanta, Georgia area, hereinafter referred to as security; directly or indirectly,  make an untrue statement of material fact, when the said Defendant misrepresented to  **LEON D. HADLEY**, for the purpose of inducing **LEON D. HADLEY** to purchase said security,  that  **LEON D. HADLEY** would receive 30% of all revenues generated from the operation of a **MOD SPECTRUM** mobile telephone tower system, located in the Atlanta, Georgaia area,   within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 23

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said securities, that Basic Communications filed four lawsuits against **AMERICAN CELLFONE, INC.** a predecessor to **MOBILE INTERNATIONAL, INC.,** and **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** on or about **January 21, 1992,** said omission being material information for **LEON D. HADLEY,** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 24

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **JILL A. HADLEY**, for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that Basic Communications filed four lawsuits against **AMERICAN CELLFONE, INC.** a predecessor to **MOBILE INTERNATIONAL, INC.**, and **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, on or about **January 21, 1992**, said omission being material information for **JILL A. HADLEY**, to consider in determining whether or not said **JILL A. HADLEY**, should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 25

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **SARA J. (HADLEY) BUFFTON**, for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities,    that Basic Communications filed four lawsuits against **AMERICAN CELLFONE, INC.** a predecessor to **MOBILE INTERNATIONAL, INC.**, and **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, on or about **January 21, 1992**, said omission being material information for  **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said  **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the <u>Code of Alabama 1975</u>, against the peace and dignity of the State of Alabama.

## COUNT 26

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **ANN W. BALL,** for the purpose of inducing **ANN W. BALL** to purchase said securities, that Basic Communications filed four lawsuits against **AMERICAN CELLFONE, INC.** a predecessor to **MOBILE INTERNATIONAL,** INC., and ALL **AMERICAN COMMUNICATIONS NETWORK, INC.,** on or about **January 21, 1992,** said omission being material information for **ANN W. BALL,** to consider in determining whether or not said **ANN W. BALL,** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, within the last 5 years of this 1996 Session of this Grand Jury.

COUNT 27

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **KENNETH A. CROSBY,** for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities,    that Basic Communications filed four lawsuits against **AMERICAN CELLFONE, INC.** a predecessor to **MOBILE INTERNATIONAL, INC.,** and **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** on or about **January 21, 1992,**  said omission being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 28

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said securities,     that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia, said omission being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 29

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of a security; to wit: a **$600,000.00** Investment Contract in a **MOD SPECTRUM** mobile telephone tower system in the Atlanta, Georgia area, hereinafter referred to as a security; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said security, that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia, said omission being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said security within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 30

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **JILL A. HADLEY,** for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia, said omission being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 31

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **SARA J. (HADLEY) BUFFTON,** for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities,    that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia,    said omission being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 32

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **ANN W. BALL,** for the purpose of inducing **ANN W. BALL** to purchase said securities, that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia, said omission being material information for **ANN W. BALL** to consider in determining whether or not said **ANN W. BALL** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 33

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities, to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities, directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **KENNETH A. CROSBY,** for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that neither **MOBILE INTERNATIONAL, INC.** nor **ALL AMERICAN COMMUNICATIONS NETWORK, INC.** had a 450 to 470 megahertz license, from the Federal Communications Commission, to operate the **MOD-SPECTRUM** system in Atlanta, Georgia, said omission being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 34

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said securities, that **ALL AMERICAN COMMUNICATIONS** and **AMERICAN CELLFONE, INC.,** the predecessor to **MOBILE INTERNATIONAL, INC.,** had received, from earlier investors, demands for refunds based upon a written admission by **MOBILE INTERNATIONAL, INC.** that these earlier investors had made their investments based upon written information that was incorrect and misleading, said omission being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 35

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **JILL A. HADLEY**, for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that **ALL AMERICAN COMMUNICATIONS** and **AMERICAN CELLFONE, INC.**, the predecessor to **MOBILE INTERNATIONAL, INC.**, had received, from earlier investors, demands for refunds based upon a written admission by **MOBILE INTERNATIONAL, INC.** that these earlier investors had made their investments based upon written information that was incorrect and misleading, said omission being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 36

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **SARA J. (HADLEY) BUFFTON,** for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that **ALL AMERICAN COMMUNICATIONS** and **AMERICAN CELLFONE, INC.,** the predecessor to **MOBILE INTERNATIONAL, INC.,** had received, from earlier investors, demands for refunds based upon a written admission by **MOBILE INTERNATIONAL, INC.** that these earlier investors had made their investments based upon written information that was incorrect and misleading, said omission being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 37

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.**, also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **ANN W. BALL**, for the purpose of inducing **ANN W. BALL** to purchase said securities, that **ALL AMERICAN COMMUNICATIONS** and **AMERICAN CELLFONE, INC.**, the predecessor to **MOBILE INTERNATIONAL, INC.**, had received, from earlier investors, demands for refunds based upon a written admission by **MOBILE INTERNATIONAL, INC.** that these earlier investors had made their investments based upon written information that was incorrect and misleading, said omission being material information for **ANN W. BALL** to consider in determining whether or not said **ANN W. BALL** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the <u>Code of Alabama 1975</u>, against the peace and dignity of the State of Alabama.

COUNT 38

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **KENNETH A. CROSBY,** for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that **ALL AMERICAN COMMUNICATIONS** and **AMERICAN CELLFONE, INC.,** the predecessor to **MOBILE INTERNATIONAL, INC.,** had received, from earlier investors, demands for refunds based upon a written admission by **MOBILE INTERNATIONAL, INC.** that these earlier investors had made their investments based upon written information that was incorrect and misleading, said omission being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 39

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **LEON D. HADLEY,** for the purpose of inducing **LEON D. HADLEY** to purchase said securities, that proceeds from the sale of these securities would be used to make full and/or partial refunds to investors in earlier projects, which had been sold by **AMERICAN CELLFONE, INC.,** said omission being material information for **LEON D. HADLEY** to consider in determining whether or not said **LEON D. HADLEY** should invest in said securities, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 40

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **JILL A. HADLEY**, for the purpose of inducing **JILL A. HADLEY** to purchase said securities, that proceeds from the sale of these securities would be used to make full and/or partial refunds to investors in earlier projects, which had been sold by **AMERICAN CELLFONE, INC.,** said omission being material information for **JILL A. HADLEY** to consider in determining whether or not said **JILL A. HADLEY** should invest in said securities, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the <u>Code of Alabama 1975</u>, against the peace and dignity of the State of Alabama.

COUNT 41

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN**, whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.**, hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **SARA J. (HADLEY) BUFFTON,** for the purpose of inducing **SARA J. (HADLEY) BUFFTON** to purchase said securities, that proceeds from the sale of these securities would be used to make full and/or partial refunds to investors in earlier projects, which had been sold by **AMERICAN CELLFONE, INC.,** said omission being material information for **SARA J. (HADLEY) BUFFTON** to consider in determining whether or not said **SARA J. (HADLEY) BUFFTON** should invest in said securities, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

COUNT 42

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **ANN W. BALL,** for the purpose of inducing **ANN W. BALL** to purchase said securities, that proceeds from the sale of these securities would be used to make full and/or partial refunds to investors in earlier projects, which had been sold by **AMERICAN CELLFONE, INC.,** said omission being material information for **ANN W. BALL** to consider in determining whether or not said **ANN W. BALL** should invest in said securities, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

## COUNT 43

The Grand Jury of said County charge that before the finding of this indictment, **THOMAS ANDERSON BOWDOIN, Jr.,** also known as **ANDY BOWDOIN,** whose name is to this Grand ~~Jury otherwise unknown, hereinafter referred to as Defendant, did, within the last 5 years of this~~ 1996 Session of this Grand Jury, contrary to law, willfully and unlawfully, in connection with the offer, purchase or sale of securities; to wit: shares of common stock issued by **ALL AMERICAN COMMUNICATIONS NETWORK, INC.,** hereinafter referred to as securities; directly or indirectly, omitted to state a material fact necessary in order to make the statement(s) made, in light of the circumstances under which they were made, not misleading, when the said Defendant omitted to state to **KENNETH A. CROSBY,** for the purpose of inducing **KENNETH A. CROSBY** to purchase said securities, that proceeds from the sale of these securities would be used to make full and/or partial refunds to investors in earlier projects, which had been sold by **AMERICAN CELLFONE, INC.,** said omission being material information for **KENNETH A. CROSBY** to consider in determining whether or not said **KENNETH A. CROSBY** should invest in said securities, within Montgomery County, Alabama, in violation of Section 8-6-17(a)(2), of the Code of Alabama 1975, against the peace and dignity of the State of Alabama.

_District Attorney, Fifteenth Judicial Circuit of Alabama_

TAB 4

ALA MA JUDICIAL INFORMATION S TEM

* * * IN THE DISTRICT COURT OF WILCOX COUNTY * * *

AGENCY NUMBER:                           WARRANT NUMBER: WR 97 000016.00
                                         OTHER CASE NBA:

C O M P L A I N T

BEFORE ME THE UNDERSIGNED JUDGE/CLERK/MAGISTRATE OF THE DISTRICT  COURT OF
WILCOX COUNTY, ALABAMA, PERSONALLY APPEARED  CHRIS YOUNG
WHO BEING DULY SWORN DEPOSES AND SAYS THAT HE/SHE HAS PROBABLE CAUSE FOR
BELIEVING, AND DOES BELIEVE THAT   THOMAS ANDERSON BOWDOIN
WHOSE NAME IS OTHERWISE UNKNOWN TO THE COMPLAINANT

ON FEBRUARY 4 1992 THOMAS ANDERSON BOWDOIN AKA ANDY BOWDOIN WITHOUT
HAVING FIRST BEEN REGISTERED AS AN AGENT IN THE OFFICE OF THE
ALABAMA SECURITIES COMMISSION SELL WITHIN WILCOX COUNTY SECURITIES
TO-WIT: SHARES OF COMMON STOCK ISSUED BY ALL AMERICAN COMMUNICATIONS
NETWORK INC TO STEVE STALLWORTH IN VIOLATION OF 8-6-3(A) CODE OF
ALABAMA 1975 AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA
COUNT II
ON FEBRUARY 4 1992 THOMAS ANDERSON BOWDOIN AKA ANDY BOWDOIN DIRECTLY
OR INDIRECTLY MADE OR CAUSED TO BE MADE OFFERS AND OR SALES OF
UNREGISTERED SECURITIES TO-WIT: SHARES OF COMMON STOCK ISSUED BY
ALL AMERICAN COMMUNICATIONS NET INC WITHIN WILCOX COUNTY TO
STEVE STALLWORTH IN VIOLATION OF 8-6-4 CODE OF ALABAMA 1975
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA
IN VIOLATION OF 008-006-003(A) /008-006-004        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

ON OR ABOUT FEBRUARY 4, 1992, THOMAS ANDERSON BOWDOIN, AKA ANDY
BOWDOIN DEFENDANT DID CONTRARY TO LAW WILFULLY AND UNLAWFULLY
IN CONNECTION WITH THE SALE OF SECURITIES TO-WIT: SHARES OF COMMON
STOCK ISSUED BY ALL AMERICAN COMMUNICATIONS NETWORK INC. HEREINAFTER
REFERRED TO AS SECURITIES DIRECTLY OR INDIRECTLY MAKE AN UNTRUE
STATEMENT OF MATERIAL FACT WHEN THE SAID DEFENDANT MISREPRESENTED
TO STEVE STALLWORTH FOR THE PURPOSE OF INDUCING STEVE STALLWORTH
TO PURCHASE SAID SECURITIES THAT MONEY FROM HIS INVESTMENT WOULD BE
USED TO BUIILD A COMPANY OWNED TOWER SYSTEM IN THE ATLANTA GEORGIA
AREA SAID MISREPRESENTATION BEING MATERIAL INFORMATION TO CONSIDER
IN DETERMINING WHETHER OR NOT STEVE STALLWORTH SHOULD INVEST IN
SAID SECURITIES IN WILCOX COUNTY STATE OF ALABAMA IN VIOLATION
OF SECTION 8-6-17(2) CODE OF ALABAMA 1975 AGAINST THE PEACE
AND DIGNITY OF THE STATE OF ALABAMA
IN VIOLATION OF 008-006-003(A) /008-006-004        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

COUNT IV
ON OR ABOUT FEBRUARY 4 1992 THOMAS ANDERSON BOWDOIN DEFENDANT DID
CONTRARY TO LAW WILFULLY AND UNLAWFULLY IN CONNECTION WITH THE SALE
OF SECURITIES TO-WIT: SHARES OF COMMON STOCK ISSUED BY ALL AMERICAN
COMMUNICATIONS NETWORK INC. HEREINAFTER REFERRED TO AS SECURITIES,
OMIT TO STATE A MATERIAL FACT NECESSARY IN ORDER TO MAKE THE
STATEMENTS MADE IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE
MADE, NOT MISLEADING, WHEN THE SAID DEFENDANT OMITTED TO DISCLOSE
TO STEVE STALLWORTH THAT ALL AMERICAN COMMUNICATIONS NETWORK INC.
HAD RECEIVED COMPLAINTS AND DEMANDS FOR REFUNDS FROM PREVIOUS INVESTORS,
SAID OMISSION BEING MATERIAL INFORMATION TO CONSIDER IN DETERMINING
WHETHER OR NOT STEVE STALLWORTH SHOULD INVEST IN SAID SECURITIES IN
WILCOX COUNTY, STATE OF ALABAMA,  IN VIOLATION OF SECTION 8 6 17(2)
CODE OF ALABAMA 1975, AGAINST THE PEACE AND DIGNITY OF THE STATE OF
ALABAMA
IN VIOLATION OF 008-006-003(A) /008-006-004        OF THE CODE OF ALABAMA,
AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

COMPLAINANT'S SIGNATURE

IN THE _Circuit_ COURT OF ~~Dallas~~ _Wilcox_ COUN., ALABAMA

STATE OF ALABAMA                    *
                                    *
        VS                          *           CASE NO. _CC-97-75_
                                    *
_Andy   Bowdoin_                    *
                                    *

### PLEA AGREEMENT

After discussion and negotiation between the parties, after a full explanation of rights has been given to defendant as evidenced by the attached Explanation of Rights form, and after such disclosure of information between the parties as each deems sufficient, it is agreed in this case subject to acceptance by the Court, that:

1. Defendant will enter a plea of guilty:
   _____ As charged in the complaint/information/indictment.
   _✓_ To the charge of _SECURITIES  FRAUD (Felony)_
   and the Prosecutor will move for dismissal with prejudice of all other offenses charged in the complaint/information/indictment.

2. _✓_ The prosecutor will recommend to the Court that the defendant be given a sentence of _10 - 5_  _10 years suspend, 5 year_ _unsupervised Probation_
   _____ The prosecutor will not oppose the Court's giving the defendant a sentence of _____

3. _____ The prosecutor will recommend to the Court that the sentence given to defendant by the Court be suspended and the defendant will be placed on probation for a period of _____
   _____ The prosecutor will not oppose the Court's suspending the sentence given to defendant and placing defendant on probation. _¢_

4. _✓_ (Any other matters agreed upon) _Restitution 75,000 -_
   _if D complies with with trace + all other counts will have to Rewrite_
   _Restitution in three  if D does not comply with restitution or probation_
   _years then this  will return to Prosecutor._
   This the ___11___ day of ___Dec___ 19_97_

        _Andy Bowdoin_                          _Edwin Russell_
        _____                     _____
        Defendant                               District Attorney

        _____
        Attorney for the Defendant

| State of Alabama<br>Unified Judicial System<br><br>Form C-42/44 (front)   Rev. 2/96 | EXPLANATION OF RIGHTS AND<br>PLEA OF GUILTY<br>(Felony and Misdemeanor – Circuit or District Court) | Case Number<br><br>NC-97-35 |
|---|---|---|

IN THE _Circuit_ COURT OF _Wilcox_ COUNTY, ALABAMA
<br>    (Circuit or District)         (Name of County)

STATE OF ALABAMA    v.   _Andy Bowdoin_
<br>                                                    Defendant

---

**TO THE ABOVE-NAMED DEFENDANT:** The Court being informed that you wish to enter a plea of guilty in this case, this is to inform you of your rights as a criminal defendant.

## PENALTIES APPLICABLE TO YOUR CASE

You are charged with the crime of _Security Fraud_ which is a Class _C_

☑Felony☐Misdemeanor. The Court has been informed that you desire to enter a plea of guilty   to   ☐this offense or   ☐to the crime of _____

which is a Class _____        ☐ Felony   ☐ Misdemeanor.   The sentencing range for the above crime(s) is set out below:

| MISDEMEANOR | | FELONY | |
|---|---|---|---|
| Class A | Up to one (1) year imprisonment in the county jail, or a fine up to $2000, or both | Class A | Not less than ten (10) years and not more than life or ninety-nine (99) years imprisonment in the state penitentiary, and may include a fine not to exceed $20,000. |
| Class B | Up to six (6) months imprisonment in the county jail, or a fine up to $1000, or both | Class B | Not less than two (2) years and not more than twenty (20) years imprisonment in the state penitentiary, and may include a fine not to exceed $10,000. |
| Class C | Up to three (3) months imprisonment in the county jail, or a fine not to exceed $500, or both | Class C | Not less than one (1) year and one (1) day and not more than ten (10) years imprisonment in the state penitentiary, and may include a fine not to exceed $5,000. |

You will also be ordered to pay an additional monetary penalty for the use and benefit of the Alabama Crime Victims Compensation Commission of not less than $50 and not more than $10,000 for each felony and $25 and not more than $1,000 for each misdemeanor for which you are convicted. This crime is also subject to the following enhancements or additional penalties as provided by law: (Provisions Checked Apply To Your Case)

☐ **Enhanced Punishment For Use Of Firearm Or Deadly Weapon:** §13A-5-6, *Code of Alabama* 1975, provides for the enhancement of a punishment where a "firearm or deadly weapon was used or attempted to be used in the commission of a felony." This section provides for the following punishment in such event: For the commission of a Class A Felony, a term of imprisonment of not less than 20 years; For the commission of a Class B Felony, a term of imprisonment of not less than 10 years; For the commission of a Class C Felony, a term of imprisonment of not less than 10 years.

☐ **Enhanced Punishment For Drug Sale Near School:** §13A-12-250, *Code of Alabama* 1975, provides that any person who is convicted of unlawfully selling any controlled substance within a three (3) mile radius of a public or private school, college, university or other educational institution, must be punished by an additional penalty of five years' imprisonment for each violation.

☐ **Enhanced Punishment for Drug Sale Near Housing Project:** §13A-12-270, *Code of Alabama* 1975, provides that any person who is convicted of unlawfully selling any controlled substance within a three (3) mile radius of a public housing project owned by a housing authority, must be punished by an additional penalty of five years' imprisonment for each violation.

☐ **Enhanced Punishment For Sale Of Controlled Substance To One Under 18:** §13A-12-215, *Code of Alabama* 1975, provides that anyone convicted of selling, furnishing or giving away a controlled substance to one who has not yet attained the age of 18 years, shall be guilty of a Class A Felony and the punishment imposed shall not be suspended or probation granted.

☐ **Drug Demand Reduction Assessment Act and Loss of Driving Privileges:** Section 13A-12-281 provides that, if you are convicted of a violation of §12A-12-202, 13A-12-203, 13A-12-204, 13A-12-211, 13A-12-212, 13A-12-213, 13A-12-215 or 13A-12-231, *Code of Alabama* 1975, you shall be assessed an additional fee of $1000 if you are a first-time offender or $2000 if you are a repeat offender under one of these sections. Collection of all or part of the penalty will be suspended if, with Court approval, you enter a drug rehabilitation program and if you agree to pay for a part or all of the program costs. Upon successful completion of the program, you may apply to the Court to reduce the penalty by the amount actually paid by you for participation in the program. Any suspension of the penalty can be withdrawn by the Court if you fail to enroll in or successfully pursue or otherwise fail to complete an approved program. In addition, pursuant to §13A-12-291, *Code of Alabama* 1975, if you are convicted or adjudicated of a violation of one of the offenses listed above or a violation of §13A-12-214 (unlawful possession of marijuana in the second degree), §32-5A-191(a)(3) or §32-5A-191(a)(4) (DUI) offenses involving drugs), you will lose your privilege to drive a motor vehicle for a period of six months, which shall be in addition to any suspension or revocation otherwise provided by law. --

☐ **Alcohol Related Offense:** If you are convicted of an alcohol or drug-related offense, you will be required to undergo an evaluation for substance abuse. Based upon the results of any such evaluation, you will be required to complete the recommended course of education and/or

Form C-43/44 (back)    Rev 2/96

## EXPLANATION OF RIGHTS AND PLEA OF GUILTY
(Felony and Misdemeanor -- Circuit or District Court)

treatment and to pay for the evaluation and any program to which you are referred. Failure to submit to an evaluation or failure to complete any program to which you may be referred will be considered a violation of any probation or parole you may be granted. You may also be required to attend monitoring sessions, including random drug and alcohol testing or blood, urine and/or breath, tests and to pay a fee for this service. You may request a waiver of part or all of the fees assessed if you are indigent or for any portion of time you are financially unable to pay. Community service may be ordered by the Court in lieu of the monetary payment if you are an indigent.

☐ DNA Samples for Criminal offenses in §36-18-24, Code of Alabama 1975. §36-18-25(e), provides that, as of May 6, 1994, all persons convicted of any of the offenses set out in §36-18-24, shall be ordered by the court to submit to the taking of a DNA sample or samples.

☐ Other: _____

### RIGHTS YOU HAVE AND WAIVER OF YOUR RIGHTS

Under the Constitution of the United States and the Constitution and laws of the State of Alabama, you have a right to remain silent and you may not be compelled to give evidence against yourself. Your attorney cannot disclose any confidential talks he/she has had with you. You do not have to answer any questions. If you do answer questions knowing that you have a right to silence, you will have waived your right.

You have the right to enter or stand on your previously entered plea of not guilty and have a public trial before a duly selected jury. The jury would decide your guilt or innocence based upon the evidence presented before them. If you elect to proceed to trial, you would have the right to be present, you would have the right to have your attorney present to assist you, you would have the right to confront and cross examine your accusers and all the State's witnesses, you would have the right to subpoena witnesses to testify on your behalf and to have their attendance in court and their testimony required by the Court, and you would have the right to take the witness stand and to testify but only if you chose to do so, as no one can require you to do this. If you elect to testify, you can be cross examined by the State just as any other witness is subjected to cross examination. If you elect not to testify, no one but your attorney will be allowed to comment about that fact to the jury. Your attorney is bound to do everything he/she can honorably and reasonably do to see that you obtain a fair and impartial trial.

If you elect to proceed to trial, you come to court presumed to be innocent. This presumption of innocence will follow you throughout the trial until the State produces sufficient evidence to convince the jury (or the Court if the trial is non-jury) of your guilt beyond a reasonable doubt. You have no burden of proof in this case. If the State fails to meet its burden, you would be found not guilty. You have the right to stand on one or more of the following pleas: "Not Guilty," or "Not Guilty By Reason Of Mental Disease or Defect." If you are entering a guilty plea to a charge for which you have not yet been indicted, you are waiving indictment by a grand jury and you will be pleading guilty to a charge preferred against you by a District Attorney's Information filed with the Court. IF YOU PLEAD GUILTY, THERE WILL BE NO TRIAL, YOU WILL BE WAIVING THE RIGHTS OUTLINED ABOVE, THE STATE WILL HAVE NOTHING TO PROVE, AND YOU WILL STAND GUILTY ON YOUR GUILTY PLEA. YOU WILL, HOWEVER, HAVE THE RIGHT TO APPEAL.

IF YOU HAVE ANY QUESTIONS ABOUT YOUR RIGHTS OR THE CONSEQUENCES OF PLEADING GUILTY, PLEASE LET THE COURT KNOW NOW AND FURTHER EXPLANATION WILL BE MADE.

Date _____    Judge _____

### ATTORNEY'S CERTIFICATE

I certify that the above was fully read to the Defendant by me; that I explained the penalty or penalties involved with the Defendant, that I discussed in detail the Defendant's rights and the consequences of pleading guilty; and that in my judgment, the Defendant understands the same and that he/she is knowingly, voluntarily and intelligently waiving his/her rights and entering a voluntary and intelligent plea of guilty. I further certify to the Court that I have in no way forced or induced the Defendant to plead guilty and to my knowledge no one else has done so.

Date _____    _____ Defendant's Attorney

### DEFENDANT'S STATEMENT OF WAIVER OF RIGHTS AND PLEA OF GUILTY

I certify to the Court that my attorney has read and explained the matters set forth above; that my rights have been discussed with me in detail and fully explained; that I understand the charge or charges against me; that I understand my rights, the punishment or punishments provided by law as they may apply to my case and I understand the consequences of pleading guilty; that I am not under the influence of any drugs, medicines or alcoholic beverages and I have not been threatened or abused or offered any inducement, reward, or hope of reward to plead guilty other than _____

I further state to the Court that I am guilty of the charge to which I am entering a plea of guilty, that I desire to plead guilty, that I made up my own mind to plead guilty, and that I knowingly, intelligently and voluntarily waive my right to a trial in this case. I further state to the Court that I am satisfied with my attorney's services and his/her handling of my case.

Date _____    Defendant _____

☐ _____

State of Alabama
Unified Judicial System
Form C-7A (p.1)   10/88

# CASE ACTION SUMMARY (CONTINUATION)
# SENTENCING ORDER

Case Number

CC 97E 75

STATE OF ALABAMA   v.   _____

Page Number _____ of _____ Pages

| DATE | JUDGE'S INITIALS | ACTIONS, JUDGMENTS, CASE NOTES |
|------|------------------|-------------------------------|

## Sentencing Order

The defendant and counsel, and counsel for the State of Alabama appeared in open court for the defendant to be sentenced on his/her conviction of _____
_Failure to register as accent of Ala Sex offender Comm_ .

## Habitual Felony Offender

The defendant has been given reasonable notice that the State intended to move the Court to sentence the defendant under the provisions of §§13A-5-9 and 10, Code of Alabama, 1975.

The State's motion to sentence the defendant pursuant to the Habitual Felony Offender Act is ☐ granted; ☐ denied. The Court finds the defendant has ☐ prior convictions:

## Sentence

☑ The defendant waived a sentencing hearing.

☐ The Court conducted a sentencing hearing.

☐ A pre-sentence report was requested by the defendant and considered by the Court.

☑ The defendant waived a pre-sentence investigation and report.

☐ The Court asked the defendant if he/she had anything to say why the sentence of law should not be imposed against him/her, and ☐ the defendant having had his/her say, ☑ the defendant had nothing to say, it is ORDERED as follows:

☑ The defendant is sentenced to the custody of the Commissioner of the Department of Corrections for a period of _70_ year(s), and _____ day(s), _____ month(s) ☐ his/her life, ☐ his/her life without parole.

☐ The defendant is sentenced to the custody of the Sheriff of _____ County, Alabama, for a period of _____ one year, _____ month(s), _____ day(s).

☐ The defendant is sentenced to the custody of the Warden of the City of _____, Alabama, Jail, for a period of _____ one year, _____ month(s), _____ day(s).

☐ The defendant is fined the sum of $ _____ .

☐ Y.O.A.

☐ Frank Lee Youth Center is recommended.

☐ The defendant's sentence shall be concurrent with the sentence(s) imposed in _____

☑ The defendant shall pay restitution in the amount of $ _75,000._ .

☑ The defendant shall pay the costs of this case.

☑ The defendant shall pay the Alabama Crime Victims Compensation Commission the sum of $ _12._

☐ The defendant shall reimburse the State of Alabama the costs of his/her appointed counsel in the amount of $ _____

☐ The payment of court ordered monies shall be a condition of parole, early release, S.I.R., or work release.

TAB 5

Sentence years, 1148

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
v.                                   )  CASE NOS.: CC96-1142/1143/1144
                                     )
THOMAS ANDERSON BOWDOIN,             )
                                     )
        Defendant.                   )

## DEFENDANT'S PLEA AGREEMENT

        After discussion and negotiations between the parties, after a full explanation of rights has

been given to Defendant Thomas Anderson Bowdoin, as evidenced by the attached Explanation of

Rights form, and after such disclosure of information between the parties as each deems sufficient,

it is agreed in this case, subject to acceptance by the Court, that:

        1.      Defendant Bowdoin will enter a "best interest" plea of guilty to the offense

contained in case number CC96-1142, Count I, being a Class C felony for making an untrue

statement of material fact in the sale of a security in violation of the Alabama Securities Act,

§8-6-17(a)(2). The prosecutor will recommend to the Court that the Defendant be sentenced to

four (4) years imprisonment for this felony, and will further recommend that the Defendant be

placed on unsupervised probation during this four (4) year period, on the conditions set by the

Court and this agreement.

        2.      Defendant will enter a "best interest" plea of guilty to the offenses contained in case

number CC96-1143, Count I, being a Class C felony for failure to register a security in violation of

the Alabama Securities Act, §8-6-4 (*Code of Alabama*, 1975). The prosecutor will recommend to

restitution in the amount of $15,000.00 on case number CC96-1142 and $5,000.00 on case

number CC96-1143. The parties will request the Court to enter a Restitution Order which requires

the Defendant to pay a total of $20,000.00 and to pay this sum over the term of the Defendant's

the Court that the Defendant be sentenced to two (2) years imprisonment for this felony to be served concurrently with CC96-1142, and will further recommend that the Defendant be placed on unsupervised probation during this two (2) year period, on the conditions set by the Court and this agreement.

3.      Defendant further agrees that he will be permanently barred from this day forward from engaging in the securities industry in the State of Alabama, and will not sell, attempt to sell or offer to sell, any securities in the State of Alabama in the future. Defendant agrees that the Court and the Alabama Securities Commission will enter this bar.

4.      Defendant acknowledges that there are a number of individuals and entities within the State of Alabama who made investments with the Defendant and the Defendant's companies, many of whom have taken no individual action to attempt to recover their investment from the Defendant. The Defendant affirmatively agrees and acknowledges that, in the event any of these individuals or entities file civil actions against him, that the Defendant will waive any statute of limitations defense he might have to any claim asserted for a period of one (1) year from the date the Court enters judgment on his plea.

5.      The Defendant, through Counsel, has represented to the prosecutor that he does not have substantial financial resources in order to pay full restitution, and the prosecutor has found no evidence to the contrary. Therefore, it has been determined that the Defendant shall pay partial restitution in the amount of $15,000.00 on case number CC96-1142 and $5,000.00 on case number CC96-1143. The parties will request the Court to enter a Restitution Order which requires the Defendant to pay a total of $20,000.00 and to pay this sum over the term of the Defendant's

probation as follows: $1,250.00 every three (3) months thereafter. At the appropriate time, the Alabama Securities Commission will present the Court with evidence as to how the collected money should be disbursed and the Court can make whatever Orders it feels appropriate regarding the disbursements of these funds. It is the desire of the Alabama Securities Commission to eventually disburse, on a pro rata basis, the money paid by this Defendant and any other related Defendants to all those Alabama individuals and entities who invested money with this Defendant and other Defendants regardless of where in the state the individuals resides.

6.      In addition, the Defendant has agreed to cooperate fully with the State, and testify as a witness in any upcoming pending criminal cases involving any of the following Defendants: Richard S. Sirmon, Larry Beck, Leon Austin, James Ronald Kennedy, and Charles Thomas Kersey. The Defendant acknowledges that there are a number of pending criminal cases involving these Defendants in a number of different counties in the State of Alabama. Specifically, the Defendant agrees to testify fully and truthfully concerning any of the matters of which he has knowledge involving any of the criminal trials in the State of Alabama of any of the named Defendants.

7.      As to the remaining counts or offenses in case numbers CC96-1142/1143/1144, the prosecutor will move for dismissal. The State also agrees, within thirty (30) days, to *nolle pros* all counts currently pending against the Defendant in any other county in Alabama except that the parties hereto specifically acknowledge and agree that charges are pending against this Defendant in Wilcox County, Alabama and that those charges will not be affected by this agreement and the Defendant understands that the authorities in Wilcox County intend to fully pursue those charges against him. The parties hereto agree that, due to those pending charges, they will execute this agreement but the Defendant will not enter his pleas in open Court until the Wilcox County

3

charges have been disposed of, by trial or otherwise. At that time, the Defendant will enter his pleas in this case. If the Wilcox County charges result in a conviction or plea to one or more felonies, the Defendant's plea herein will be revised so that the Defendant will plead to one felony in these cases, but all remaining terms of this agreement will remain the same, including the amount of restitution. In further clarification, it is understood that if the Defendant pleads or is convicted in Wilcox County of a felony(s) involving registration violations, he will plead to case number CC96-1142, Count I, herein. If the Defendant pleads or is convicted in Wilcox County to a felony(s) involving misrepresentation violations, he will plead to case number CC96-1143 herein. If the Defendant pleads or is convicted in Wilcox County to felonies involving both misrepresentations and registration violations, he will nevertheless plead guilty to the registration felony alleged in case number CC96-1143. The State further agrees that it will not prosecute the Defendant for any additional charges in other counties of the State regarding the same alleged plan or scheme these cases derived from, assuming no additional charges are committed from this day forth.

8.   Defendant Bowdoin and his attorney have signed and executed an Explanation of Rights and Plea Of Guilty to the felonies simultaneously with the filing of this written plea agreement.

DATED this 6 day of October, 1997.

THOMAS ANDERSON BOWDOIN

4

EARL E. CLOUD, JR.
ATTORNEY FOR DEFENDANT THOMAS
ANDERSON BOWDOIN

SUSAN B. ANDERSON
DEPUTY ATTORNEY GENERAL/GENERAL
COUNSEL OF THE ALABAMA SECURITIES
COMMISSION
770 Washington Avenue, Suite 570
Montgomery, AL 36130-4700

TAB 6

## Terms of Service

**THESE TERMS OF SERVICE SET FORTH THE TERMS AND CONDITIONS UNDER WHICH GOLDEN PANDA AD BUILDER (HEREINAFTER REFERRED TO AS "GOLDEN PANDA") WILL PROVIDE ITS SERVICES. THESE TERMS ARE AN AGREEMENT BETWEEN THE ADVERTISER AND GOLDEN PANDA. THE TERMS DESCRIBE THE ADVERTISER'S RIGHTS AND OBLIGATIONS WHEN USING THESE SERVICES.**

**THE TERMS OF SERVICE ALSO DESCRIBES THE RIGHTS AND OBLIGATIONS OF GOLDEN PANDA. THE ADVERTISER MUST READ THESE TERMS OF SERVICE CAREFULLY AND BE SURE THAT HE OR SHE UNDERSTANDS THESE TERMS OF SERVICE. IF THE ADVERTISER DOES NOT AGREE TO THESE TERMS OF SERVICE, THE ADVERTISER SHOULD NOT ACCESS OR USE THE SERVICES OF GOLDEN PANDA.**

1.1. Creation or use of an account with Golden Panda means the Advertiser accepts ALL the terms and conditions of this agreement and is bound by the terms herein.

1.2. The parties to this agreement are Golden Panda and the Advertiser.

1.3. In this agreement, "you" or "your" means any person or entity of whatsoever nature using the Service ("Advertisers"). Unless otherwise stated, "we," or "our" will refer collectively to Golden Panda.

2. Although we will attempt to keep members informed of any changes in these Terms of Service, we may amend this Agreement at any time without any prior notification by posting the amended terms on our site. We may notify you via the e-mail address you have on file with Golden Panda of any changes to the terms. Golden Panda expressly reserves the right to make said changes and same may be posted on the website or otherwise noticed to members/advertisers in addition to or in lieu of the hereinabove mentioned e-mails.

3. We value our Advertisers and want to provide them with a results-oriented advertising program. To offer you the best service, all advertisers need to follow the same Terms of Service. These Terms of Service are intended to make Golden Panda the most efficient and profitable advertising program in the industry.

### Advertising Rebates

Rebates are paid to advertisers for viewing other advertiser's websites.

We have an innovative advertising rebate. An advertiser can receive 125% of their advertising cost in rebates by viewing up to 30 web sites of other advertisers on a daily basis for 15 seconds each. An advertiser must have an active ad package to earn rebates.

Sometime between 12:01 am and 9:00 am Eastern Standard Time (EST), we total the number of ad package sales from the previous day and the commissions received from Golden Panda's external income sources.

We multiply the total of all these sales by 50%. We then divide this total by the total number of outstanding ad packages. This determines the amount of rebate to be paid per ad package. That amount will be multiplied by the number of ad packages in each advertiser's account and the total will be credited to his/her

cash account on a daily basis. Rebates will show up in advertiser's accounts after midnight EST. If you miss a day of viewing the required number of web sites, you do not earn any rebates for that day only.

Advertisers will be paid rebates until they receive 125% of their ad purchases.

To maintain the stability of the program the daily rebate will be capped at 8%. Any excess will go into a reserve account to be used when rebates are extremely low. Five percent (5%) of ad package sales, banner ad sales and/or external income sources on the Ad Builder will be placed in the reserve account to be used for the same purpose.

Your ad purchase will expire when you receive a 125% rebate of your advertising cost.

Five percent will be used for contests or raffles.

Fifteen percent will be used for referral commissions.

Fourteen percent will be paid to various boards, trainers and designers.

Eleven percent will be used for administrative costs, customer support, hosting, site maintenance, advertising and profit.

### Referral Commissions:

An advertiser may pay a monthly membership fee and increase referral commissions and decrease the number of sites to view on a daily basis. The amount of your monthly membership fee determines the amount of your referral commissions and the number of sites you must view each day to receive your rebates.

If you do not pay a membership fee you will be paid a 3% referral commission on all of your personal sales only. Free members cannot earn rebates.

When you pay a $20.00 per month membership fee you earn a 7% referral commission on your personal sales and 4% on your second level sales. When you pay a $100.00 per month membership fee you earn a 10% referral commission on your personal sales and 5% on your second level sales. All rebates and referral commissions can be changed at any time with a 10-day notice to Advertisers. Any such notice will be sent by email to the email address you used to join as an Advertiser, or displayed in an updated Terms of Service, on your replicated website or in our Golden Panda News website. *Cash out privileges are explained in the Cash out Section.

### Ad Packages and Credits

All payments made to Golden Panda are considered advertising purchases, not investments or deposits of any kind. All sales are final. Golden Panda does not guarantee any earnings and/or rebates. All rebates paid to advertisers are for the service of viewing other advertiser's web sites. All commissions are for referring advertisers to Golden Panda. All advertising purchases are non-refundable after the passing of the 3 days right of rescission.

Each ad package is $1.00 and is made up of 1 credit. You get 1 showing of your web site for each credit. The minimum ad purchase is $10.00. The minimum cash out is $10.00.

You receive 1 credit (1 showing of your web site) for each site you view. Depending on your membership level, you must view up to 30 web sites each day for 15 seconds each to receive your daily rebate. Viewing up to 30 sites daily will provide you with enough credits to keep your web site showing every day.

You can view a maximum of 72 web sites per day. This should enable you to keep 3 web sites showing on a daily basis. You can show one web site, for 10 days, view web sites and earn credits even as a free member.

## Maximum Ad Purchases

You may purchase a maximum of 50,000 ad packages at $1.00 each, per monthly cycle, which begins on the 1st of each month and ends on the last day of each month, at any one time for a total of $50,000.00. If you desire to purchase a single amount greater than this, you will need approval from the company Chief Executive Officer, Clarence Busby, Jr.

Number of Web Sites that can be Advertised

Free Members can advertise 1 web site for 10 days. If you have purchased ad packages and are not paying a membership fee, you can advertise 3 web sites for as long as you have active ad packages. If you pay a membership fee of $20.00 per month you can advertise 4 web sites for as long as you have active ad packages.. If you pay a membership fee of $100.00 per month you can advertise 5 web sites for as long as you have active ad packages.

## Advertising and Promotion

To maintain the integrity of advertisers advertising the Golden Panda Advertising Program, certain requirements and guidelines governing the advertising and promotion by Golden Panda's advertisers must be imposed. Misuse of the Golden Panda name or logo and its affiliated products diminishes the goodwill of the Company, affects all Golden Panda advertisers and is strictly prohibited. You may NOT copy any portion of the website(s) or Golden Panda sponsored websites without permission from Golden Panda. Personal advertising that contains any of the above will need to be approved by the Golden Panda Administration, in writing.

1. **Use of Authorized Promotional Materials:** Only the materials that are made available directly by Golden Panda may be used for advertising or promoting Golden Panda. Golden Panda will produce and offer for sale, at a reasonable price, (or at no cost) materials that can be used to promote your business. No reproduction, personalization or modification of any of these Golden Panda materials is allowed unless approved in writing by Golden Panda. Advertisers may not develop, publish, sell or distribute any Golden Panda related promotional materials they create. Any violation of this policy may result in termination of your membership.

2. **Blind Ads:** No radio or television advertising of any type is permitted without written permission of Golden Panda. You may use Blind Ads (advertising that does not mention Golden Panda) without approval.

3. **Other forms of Advertising:** Remember, Golden Panda is NOT an investment company. Golden Panda does NOT sell investments. You do NOT invest in Golden Panda. You do NOT re-invest in Golden Panda. As an OPTION you can purchase advertising packages and earn cash rebates by viewing our advertiser's websites. You do not get paid back... you earn cash rebates. Golden Panda does not make any guarantees as to the amount of daily rebates. Even though sponsoring is not required to earn cash rebates,Golden Panda is

not a "passive" program. You are required to purchase advertising packages and view advertiser's websites to earn cash rebates. You only earn cash rebates on the days you view a required number of websites.

As an advertiser participating in our rebate program it is your responsibility to read and understand the Golden Panda program. Golden Panda currently offers on-line training as well as comprehensive details throughout our website. If you sponsor other advertisers it is your responsibility to present the program in a knowledgeable manner, giving your referrals sufficient information so they can make an informed decision. There is no excuse for false statements or misrepresentation of the program.

When you join Golden Panda you are required to agree to the **TERMS** and **CONDITIONS**. Golden Panda expects you to know what you are agreeing to and act responsibly when representing Golden Panda.To be clear, at no time can you make false claims or statements. Doing so may cause your immediate removal from the company and loss of any potential rebates.

**ANY** and **ALL** advertising must be approved by Golden Panda or taken from our pre-approved ads available for you (applies once service is implemented). They are located on the GOLDEN PANDA News site which can be found when you log in to your replicated website. Approval is required for (but not limited to) email advertising, private websites, blogs, forums, social networking sites, mailers, pamphlets, flyers, any and all printed material and all forms of verbal communications PRIOR to the commencement of your chosen form of advertising.

You are expressly **FORBIDDEN** from any form of "Check Waving". This is ILLEGAL. You cannot place income charts in personal advertising. You can not show any proof of income in the form of checks or deposits you receive. Anyone caught using these methods as a way of enticing another individual to purchase advertising may IMMEDIATELY be dismissed and forfeit any current or future earnings.

4. **Business Cards/Stationery:** Golden Panda offers business cards and stationery through an approved independent vendor. Advertisers may use the services of a printer of their choice, providing that Golden Panda's guidelines are followed. The Golden Panda logo may be duplicated on the business card or stationery, but the words "Independent Contractor" must appear immediately after the logo. All that may be printed on the card is phone number(s), two lines of address, advertiser's name, e-mail address and web address with your referral link or redirect address.

5. **Business Names:** Golden Panda's advertisers may not use the word Golden Panda or Golden Panda Ad Builder within another business name.

6. **Copyrights:** Golden Panda reserves ownership rights to the contents and design of all Golden Panda's published materials and web sites.

7. **Telephone Calls:** Advertisers shall not answer the telephone "Golden Panda" or Golden Panda Ad Builder, or give an answer that creates an impression that he/she has reached the corporate office of Golden Panda.

8. **Prerecorded Telephone Solicitation Devices:** Golden Panda's name or copyrighted material may not be used in automatic calling devices or "boiler room" operations to solicit Golden Panda's products or services.

9. **Media Inquiries:** Golden Panda's advertisers may not solicit coverage or publicity from the media regarding the Golden Panda business, nor may they appear on radio or television talk shows to promote

their Golden Panda activities. If a Golden Panda advertiser is contacted by the Media (radio, television, the press, or other), the contact should be referred to the Golden Panda corporate office in order to maintain information accuracy and a consistent Company image.

## Member Responsibilities:

- All members are responsible for the following:
- Read our Frequently Asked Questions (FAQs)
- You must sign up with your own, unique email address.
- You must sign up with our choice of payment processors. They are listed during the sign-up process. They include but may not be limited to; Golden Panda Approved Debit Cards, Solid Trust Pay Solutions, Alert Pay etc.
- You may be sponsored by or receive 1st or 2nd-level referral commissions from anyone in your same household, with the approval of your sponsor. (Example: Each person would have to be operating their own business, and that may be monitored).
- In order to be an advertiser of Golden Panda, you must have your own product, program or opportunity to advertise or have access to a website for which you are an authorized reseller with the right to advertise.
- If you have problems viewing ads, you must submit a support ticket the SAME day you have the viewing problem.
- If you're "Home Page" or "History" page is not reflecting the proper credit, dates, rebates or commissions, you must submit a support ticket the SAME day the problem occurred.
- You must know the time zone and the cut off time for viewing web sites. You have twenty-four (24) hours to view up to thirty (30) websites, which corresponds with your member level. A day at GOLDEN PANDA begins at 12:01 a.m. EST and ends at 12:00 a.m. EST.
- You MUST be courteous to our administration staff at all times, regardless of any problems you are experiencing.
- When making an advertising purchase with any payment processor, be sure to follow the process all the way through so that the purchase is reflected on your Golden Panda account.
- You must be willing and able to receive emails from Golden Panda as a requirement of your membership.
- Be aware that if you use emails such as @AOL, @hotmail, @yahoo, @BellSouth or @MSN addresses, you may not always receive our emails because of their SPAM systems. If this occurs, please use a different email address or check your bulk mails. Thus far we have had no problems with @Gmail.

## User-Supplied Content:

Golden Panda's services and materials may be used for lawful purposes only.

**Spam**: If you are found to have spammed, Golden Panda reserves the right to disable or terminate your account immediately and without warning.. All funds will be forfeited. Golden Panda may impose a penalty for each spam policy violation. Golden Panda also reserves the right to determine what violates this policy, in which case, any violation that occurs will result in account termination without refund of any monies.

**Refusal of Service: Golden Panda**, at its sole discretion, reserves the right to refuse or cancel service to any Advertiser. Violation of any polices, rules or regulations could result in a warning or possible account termination. Accounts may be terminated for any reason and without any prior notice to the Advertiser.

Accounts terminated due to policy violations will not be subject to refunds.

**Each site that you promote on Golden Panda's web site must comply with the following rules:**

1. Web sites advertised must not have any pop-up windows, pop-in windows, downloads, redirects, Trojans or malicious code.

2. Web sites advertised must not be broken, under-construction, or slow-loading.

3. Web sites advertised must not contain the following themes: pornography, gambling, matchmaking, mail-order brides, religion, politics, Gothic, Wicca, Satanism, war games and must not contain violent or inappropriate content. GOLDEN PANDA reserves the right to determine unacceptable themes.

4. Do not promote your Goldenpandaadbuilder.com referral page with the Golden Panda rotator. Any sites submitted using Golden Panda web site will be deleted.

5. We do not allow Rotators or URL Trackers of any kind.

6. We will accept sites in any language, but your largest target markets are English and Chinese.

If you break any of the above rules, your account may be deleted without notice and all funds will be forfeited.

**Waiver:** In keeping with these terms, I, the advertiser, furthermore release and forever discharge and hold harmless Golden Panda Ad Builder, Inc. Golden Panda, it's heirs, successors and assigns and employees from any liability, claims and or demands of any kind or nature either in law or in equity, which arise or hereafter arise from my advertising purchases.

**Indemnification:**

The advertiser agrees that it will protect, indemnify, save and hold Golden Panda harmless from any and all liabilities, losses, expenses and claims, as well as reasonable attorney's fees assessed against Golden Panda, its agents, officers, employees and administration that may arise or result from any service provided or performed or agreed to by any product sold by its advertisers or customers, agents, employees or assigns. Advertiser agrees to defend, indemnify and hold Golden Panda harmless against liabilities arising out of, but not limited to, (1) any injury to person or property caused by any products sold or distributed by advertiser and advertised on Golden Panda web site, (2) any material furnished by advertiser infringing or allegedly infringing on the rights of a third party, and (3) copyright violation and any defective products sold to a customer from the Golden Panda web site.

**Cash Outs and Upgrades:**

All cash outs are reviewed manually for accuracy and increased security to protect each member's money.

Cash outs are typically completed on the following Thursday after the cash out request has been made by midnight the previous Friday. There will not be any cash outs paid on Saturday, Sunday or Holidays. The minimum cash out is $10.00 and the minimum upgrade is $10.00.

There is cash out fee if you do not pay a monthly membership fee. The fee depends upon your payment

processor or the method of your cash out. There is no cash out fee on checks sent from Golden Panda.

1. If you pay a monthly membership fee, Golden Panda will not charge you a fee up and above the fee charged by your payment processor. If you pay a membership fee you will not be charged a cash out fee if you request to be paid by Golden Panda's check system. There will be a handling and mailing charge for any overnight payments.

2. Due to security reasons you may NOT call the office for cash out requests. There are a variety of options to choose from when you click on the cash out button.

3. If you have bought Ad Packages with more than one payment method, you will be asked to select the account to which your cash outs can be paid. You may request to be paid by a check from Golden Panda or by a payment processor as available.

4. We reserve the right to assess fees as per our Fee Schedule. All fees are displayed and calculated in US Dollars.

5. You understand that you will need a valid e-mail address for communication purposes, and you agree to maintain the e-mail address provided on the release form attached to this agreement as long as you use the services of Golden Panda. If you have a change in your e-mail address, you agree to notify Golden Panda of these changes before further using the Service offered by Golden Panda.

5.1. If you open a Golden Panda account, you hereby consent to receive periodic newsletters and other types of e-mail communications from Golden Panda, including customer service issues, new product offers and other matters. We reserve the right to e-mail you at any time regarding issues related to your account and your use of your Golden Panda account.

5.2 You agree to and understand the full Terms of Service of Golden Panda, and you agree to and understand that Golden Panda has the right to terminate your account for any violations of the terms to which you have agreed, and all your funds would be forfeited.

6. You agree that all transactions involving your Golden Panda account are final and not reversible, and you understand that there is no refund available after completing a transaction.

6.1. You agree that you are liable for any transactions made from your account, and you agree to indemnify, defend and hold harmless Golden Panda for any transaction of whatsoever nature processed from your account.

7. You agree that you will not file a chargeback with your credit card company or bank account against Golden Panda, and if you do file a chargeback, your account will be terminated and all funds in your Golden Panda account will be forfeited and you will be banned from using the services of Golden Panda in the future.

8. You acknowledge and accept that in the case of a claim of unauthorized transactions, the presumption shall be that all transactions are authorized by you and are your liability.

9. Golden Panda agrees that we will not share your personal information with any third parties other than authoritative officials with authoritative rights. We will not surrender any of your information unless a court

order and/or a Subpoena and/or a Protective Order is presented to us, and then we will abide by the laws of the United States and surrender your information only to the proper authorities who have the legal rights to said information. We view protection of Advertisers' privacy as a very important principle. We store and process your personal information on computers located in the United States and elsewhere as we deem necessary that are protected by physical as well as technological security devices.

10. Nothing contained on www.Goldenpandaadbuilder.com should be understood as granting you a license to, but not limited to, use any of the trademarks, service marks, or logos owned by Golden Panda or by any third party.

11. You must not divulge your password to anyone else, nor may you use anyone else's password. You agree that Golden Panda will treat any person accessing your account using your password as you, and you understand and agree that any action taken by any person using your password shall be binding on you and all other parties involved in said action.

11.1. Golden Panda is not responsible for any losses incurred by you as the result of the misuse of your password.

12. In order to use the service, you must register for a Golden Panda account at www.Goldenpandaadbuilder.com. You may hold more than one Golden Panda account per household, and this may be used for business or personal transactions. Our services are only available to individuals or businesses that can form legally binding contracts under applicable law.

13. If you are an international Advertiser, you warrant that you are violating no law or regulation in your jurisdiction or any other jurisdiction by advertising with Golden Panda.

14. We are not an escrow service, and we make no guarantee of a product or service or the quality of a product or service you may receive from another Advertiser after purchasing it through www.Goldenpandaadbuilder.com account as we are not the person selling the product or service. If you have a complaint about the product or quality of the product, you agree to contact the Advertiser from whom you purchased the product or service and indemnify, defend and hold harmless Golden Panda. We do not and cannot ensure the quality, safety, or legality of any merchandise received, or that the seller will even ship the merchandise.

15. We agree to initiate ACH (Automated Clearing House) transfers to and from your bank account only after you request the transaction through your Golden Panda account, and we agree that the transaction will only be for the amount you request, less any applicable fees as found in our Fee Schedule on www.Goldenpandaadbuilder.com additional standard transactional banking or other appropriate standard transactional fees. (Applies only when ACH is implemented.)

16. We and our suppliers provide our services "as is" and without any warranty or condition, express, implied or statutory. We and our suppliers specifically disclaim any implied warranties of title, merchantability, fitness for a particular purpose and non-infringement. Company does not warrant that the site or the service will meet your requirements or that the operation of the site or the service will be uninterrupted or error-free. The information and services may contain bugs, errors, problems or other limitations. We and our affiliated parties have no liability whatsoever for your use of any information or service. Golden panda shall make reasonable efforts to ensure that requests for all payments and cash outs are processed in a timely manner but we make no representations or warranties regarding the amount of time

needed to complete processing because our service is largely dependent upon many factors outside of our control, such as delays in the banking system or the U.S. or international mail service.

17. in no event shall we or our suppliers be liable for lost profits or any special, incidental or consequential damages arising out of or in connection with our web site, our service, or this agreement (however arising, including negligence).

18. Golden Panda will not be responsible for delays or failures in the transmission, receipt or execution of orders, payments, deliveries or information due to events beyond its control (acts of God). The obligations of this contract precede any government enactment.

19. We have the right to refuse service to particular individuals or entities, at our sole discretion, with or without cause.

20. We will suspend or re-activate a Golden Panda account, if ordered to do so by an Order from a court or arbitration body of acceptable jurisdiction, as determined by Golden Panda.

21. Solely to enable Golden Panda to use the information with which you supply us, so that we are not violating any rights you might have in that information, you agree to grant us a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, sub-licensable (through multiple tiers) right to exercise the copyright, publicity, and database rights (but no other rights) you have stored in your Golden Panda account, in any media now known or not currently known, with respect to the information you have provided to Golden Panda.

22. Golden Panda and all related logos, products and services described in this website are either trademarks or registered trademarks of Golden Panda, or its licensors, and (aside from the circumstances described below) may not be copied, imitated or used, in whole or in part, without the prior written permission of Golden Panda. In addition, all page headers, custom graphics, button icons, and scripts are service marks, trademarks, and/or trade dress of Golden Panda and may not be copied, imitated, or used, in whole or in part, without the prior written permission of Golden Panda.

22.1 Notwithstanding the above, HTML logos or website payments features may be used without prior written consent for the purpose of directing web traffic to www.Goldenpandaadbuilder.com. These logos may not be altered, modified, or changed in any way, or used in a manner that is disparaging to Golden Panda. Logos may not be displayed in any manner that implies sponsorship or endorsement by Golden Panda. Golden Panda is an advertising company, and no partnership, joint venture, employee-employer or franchiser-franchisee relationship is intended or created by this Agreement.

23. You agree that you will not use any device, software or routine to interfere with the proper working of the site or any activities conducted on our site. You agree that you will not take any action that imposes an unreasonable or disproportionately large load on our infrastructure. Much of the information on our site is proprietary or is licensed to Golden Panda by our Advertisers or third parties. You agree that you will not copy, reproduce, alter, modify, create derivative works, publicly display or frame any content (except for your personal information) from our web site without the prior expressed written permission of Golden Panda or the appropriate third party. If you use, or attempt to use our web site for purposes other than sending and receiving payments and rebates and managing your account, including but not limited to tampering, hacking, modifying or otherwise corrupting the security or functionality of our site, your account will be terminated, your available funds will be forfeited, and you will be subject to damages and other

penalties including criminal prosecution when applicable.

24. You may close your account at any time by submitting a ticket using our support system on www.Goldenpandaadbuilder.com with the appropriate topic title: Close Account. Upon the termination of an account, any and all pending transactions will be cancelled and all unclaimed rebates are forfeited. You will remain liable for all obligations related to your account even after such account is closed.

25. Without limiting other remedies, we may update inaccurate or incorrect information you provide to us, contact you by means other than electronically, immediately warn our community of your actions, place a hold on funds in your account, limit funding sources and payments, limit access to an account and any or all of the account's functions (including but not limited to the ability to send money or making withdrawals from an account), limit withdrawals, indefinitely suspend or close your account and refuse to provide our Services to you if:

- You breach this Agreement or the documents it incorporates by reference.
- We are unable to verify or authenticate any information you provide to us.
- We believe that your account or activities pose a significant credit or fraud risk to us or the public.
- We believe that your actions may cause financial loss or legal liability for you, our Advertisers or us.

25.1. To secure your performance of this Agreement, you grant to Golden Panda a lien on and security interest in your account.

26. You may not transfer any rights or obligations you may have under these Terms of Service without the prior written consent of Golden Panda. Golden Panda reserves the right to transfer these Terms of Service or any right or obligation under these Terms of Service without your consent.

27. You must comply with all applicable U.S. and international laws, statutes, ordinances, regulations, contracts and applicable licenses regarding your use of our Services. Golden Panda is not responsible to establish your legal right to use our services. Such requirements rest entirely on the Advertiser. Earnings over $600 per year will be reported to the IRS for US residents.

28. Any controversy or claim arising under or related to these Terms of Service shall be settled by arbitration in accordance with the International Arbitration Rules of the American Arbitration Association before a single arbitrator appointed by mutual consent of the parties to these Terms of Service. The language of the arbitration shall be English.

29.1. These Terms of Service are governed by the laws of Nevis as Golden Panda is incorporated in Nevis.

29.2. In the event that any provisions of these Terms of Service shall be determined by an arbitration body or a court of competent jurisdiction to be unenforceable in any jurisdictions, such provision shall be unenforceable in that jurisdiction and the remainder of these Terms of Service shall remain binding upon the parties as if such provisions were not contained therein. The enforceability of such provision shall otherwise be unaffected and remain enforceable in all other jurisdictions.

30. These Terms of Service are governed by and interpreted under the laws of Nevis as such laws are applied to agreements entered into and to be performed entirely within Nevis by residents and the jurisdiction of Nevis. You agree that this Agreement and all incorporated agreements may be automatically assigned by Golden Panda, in our sole discretion, to a third party in the event of a merger or acquisition.

Our failure to act with respect to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches. These Terms of Service set forth the entire understanding between both parties with respect to the subject matter hereof.

31. The Services are offered by Golden Panda Ad Builder, located currently at 4900 Ivey Rd., Suite 820, Acworth, GA 30101.

32. Disputes between you and Golden Panda regarding our Services may be reported to Customer Support using our online ticket system at any time, or by calling (678) 738-1440. Our return phone calls will only be between the hours of 8:30 AM and 5:30 PM Eastern Standard Time.

If you do not abide by these terms and conditions, Golden Panda has the option to terminate your account immediately.

Golden Panda reserves the right to change the terms and conditions of this site and Agreement at any time.


Golden Panda Ad Builder, Ltd

By: Clarence Busby, Jr.

Chief Executive Officer


Updated: July 23, 2008

TAB 7

~~Terms of Service for Member~~

THESE TERMS OF SERVICE SET FORTH THE TERMS AND CONDITIONS UNDER WHICH ADVIEWGLOBAL, (HEREINAFTER REFERRED TO AS AVGLOBAL") WILL PROVIDE ITS SERVICES.  THESE TERMS ARE AN AGREEMENT BETWEEN THE MEMBER AND AVGLOBAL.  THE TERMS DESCRIBE THE MEMBER'S RIGHTS AND OBLIGATIONS WHEN USING THESE SERVICES.

THE TERMS OF SERVICE ALSO DESCRIBES THE RIGHTS AND OBLIGATIONS OF AVGLOBAL.  THE MEMBER MUST READ THESE TERMS OF SERVICE CAREFULLY AND BE SURE THAT HE OR SHE UNDERSTANDS THESE TERMS OF SERVICE.  IF THE MEMBER DOES NOT AGREE TO THESE TERMS OF SERVICE, THE MEMBER SHOULD NOT ACCESS OR USE THE SERVICES OF AVGLOBAL.

1.1 Creation or use of an account with AVGLOBAL means the Member accepts ALL the terms and conditions of this agreement and is bound by the terms herein.
1.2 The parties to this agreement are AVGLOBAL and the Member.
1.3 In this agreement, "you" or "your" means any person or entity of whatsoever nature using the Service ("Members").  Unless otherwise stated, "we" or "our" will refer collectively to AVGLOBAL.
2.   Although we will attempt to keep Members informed of any changes in these Terms of Service, we may amend this Agreement at any time without any prior notification by posting the amended terms on our site.  We will notify you via the e-mail address you have on file with AVGLOBAL of any changes to the terms.  AVGLOBAL expressly reserves the right to make said changes and same may be posted on the website or otherwise noticed to Members in addition to or in lieu of the hereinabove mentioned e-mails.
3.   We value our Members and wish to provide them with a results-oriented program.  To offer you the best service, all Members need to follow the same Terms of Service.  These Terms of Service are intended to make AVGLOBAL the most efficient and profitable advertising program in the industry.

**Viewing Incentive Program (V.I.P.)**
Advertiser's websites will be viewed through the VIP Program, available to Advertisers who choose to become AVGLOBAL Members.  Becoming an AVGLOBAL Member is a separate activity from becoming an Advertiser, and is controlled by this Member Terms of Service.

AVGLOBAL has an innovative VIP Program.  A Member who is also an Advertiser can recoup a portion of their advertising costs by viewing 24 web sites of other Advertisers on a daily basis for 15 seconds each.

Sometime between 12:01 am and 9:00am Central Standard Time (CST), AVGLOBAL totals the number of page impression sales, banner ad sales, ebook sales and from any products or services marketed by AVGLOBAL.

AVGLOBAL multiplies the total of all these sales by 50%.  AVGLOBAL then divides this total by the total number of outstanding page impressions.  This determines the amount to be paid per page impression.  That amount will be multiplied by the number of ad packages in each Advertiser's account and the total will be credited to his/her Member cash account on a daily basis.  VIP incentive payments will show up in Member's accounts after midnight CST.  If a Member misses a day of viewing the required number of web sites, the Member does not earn any VIP incentives for that day only.

Members will be paid VIP incentives based upon "incentive qualified" page impressions. Page Impressions remains "incentive qualified" for 150 days. The page impressions will expire at the end of 150 days.

To maintain the stability of the program the daily VIP incentive payments will be capped at 8%. Any excess will go into a reserve account to be used when VIP incentive payments are extremely low.

Five percent will be used for contests and raffles.

Fifteen percent will be used for referral commissions.

Up to fourteen percent will be paid to various boards, trainers and designers.

Sixteen percent will be used for administrative costs, customer support, hosting, site maintenance, advertising and profit.

**Referral Commissions**
A Member may pay a monthly membership fee and eliminate fees for cash outs, increase referral commissions and decrease the number of sites to view on a daily basis. The amount of your monthly membership fee determines the number of times you can cash out each week (cash out is explained in the cash out section), the amount of your referral commissions and the number of sites you must view each day to receive your VIP incentive payments.

If you do not pay a membership fee you will be paid a 3% referral commission on all of your personal sales only. Members not paying a membership fee cannot earn commissions on second level ad package sales.

When you pay a $10.00 per month membership fee you earn a 5% referral commission on your personal sales and 3% on your second level sales. When you pay a $25.00 per month membership fee you earn a 7% referral commission on your personal sales and 4% on your second level sales. When you pay a $75.00 per month membership fee you earn a 10% referral commission on your personal sales and 5% on your second level sales. This could mean a tremendous amount of income to you and you decide which is better for you. All incentive payments and referral commissions can be changed at any time with a 10 day notice to Members. Any such notice will be sent by email to the email address you used to join as a Member.

**Page Impressions and Credits**
All purchases from AVGLOBAL are considered advertising purchases or membership fees, not investments or deposits of any kind. All sales are final. AVGLOBAL does not guarantee any earnings, nor the continuation of the Referral Program or the VIP Program, in their present or modified form.

Each ad package is $1.00 and is made up of 1 credit. Advertisers get 1 showing of their web site for each credit. The minimum page impression purchase is $10.00. The minimum Member cash out is $10.00.

Advertisers who choose to become Members and participate in the VIP Program will receive 1 credit (1 showing of their web site) for each site they view. Each member must view 24 web sites each day for 15 seconds each to receive their daily incentive payment. Viewing 24 sites daily should provide members with enough credits to keep their web site showing every day.

Members can view a maximum of 72 web sites per day. This should enable the Member to keep 3 web sites showing on a daily basis. You can show one web site, view web sites, earn credits and viewing incentives even as a free member.

### Maximum Page Impression Purchases
A member may purchase a maximum of $9500.00 of page impressions per web site. There is not a maximum when you purchase additional page impressions with viewing incentive commissions and referral commissions.

### Number of Web Sites that can be Advertised
Free Members can advertise 1 web site for 30 days. You can advertise web sites for as long as you have credits. If you pay a membership fee of $10.00 per month you can advertise 3 web sites for as long as you have credits. If you pay a membership fee of $25.00 per month you can advertise 4 web sites for as long as you have credits. If you pay a membership fee of $75.00 per month you can advertise 5 web sites for as long as you have credits.

### Advertising and Promotion
To maintain the integrity of advertisers advertising the AVGLOBAL Advertising Program, certain requirements and guidelines governing the advertising and promotion by AVGLOBAL's advertisers must be imposed. Misuse of the AVGLOBAL name or logo and its affiliated products diminishes the goodwill of AVGLOBAL, and affects all AVGLOBAL advertisers and is strictly prohibited.

1.  **Use of Authorized Promotional Materials:** Only the materials that are made available directly by AVGLOBAL may be used for advertising or promoting AVGLOBAL. AVGLOBAL will produce and offer for sale, at a reasonable price, materials that can be used to promote your business. No reproduction, personalization or modification of any of these AVGLOBAL materials is allowed unless approved in writing by AVGLOBAL. Members may not develop, publish, sell or distribute any AVGLOBAL related promotional materials they create. Any violation of this policy may result in termination of your membership.
2.  **Blind Ads:** No radio or television advertising of any type is permitted without written permission of AVGLOBAL. All print ads cannot include the name of AVGLOBAL, it must be a blind ad.
3.  **Product Claims:** AVGLOBAL Members shall not represent any claim for any product or service that is not explained in AVGLOBAL's advertising material. AVGLOBAL is only responsible for material printed or contained in AVGLOBAL's provided materials.
4.  **Business Cards/Stationery:** AVGLOBAL offers business cards and stationery through an approved independent vendor. Members may use the services of a printer of their choice, providing that AVGLOBAL's guidelines are followed. The AVGLOBAL logo may be duplicated on the business card or stationery, but the words "Independent Contractor" must appear immediately after the logo. All that may be printed on the card is phone number(s), two lines of address, Member's name, e-mail address and web address with your referral link or redirect address.
5.  **Business Names:** AVGLOBAL Members may not use the word ADVIEW Global within another business name.
6.  **Copyrights:** AVGLOBAL reserves ownership rights to the contents and design of all AVGLOBAL published materials and web sites.

7. ~~**Telephone Calls:** Members shall not answer the telephone "AdVIEW Global" or give an answer~~ that creates an impression that he/she has reached the corporate office of AVGLOBAL.

8. **Prerecorded Telephone Solicitation Devices:** AVGLOBAL name or copyrighted material may not be used in automatic calling devices or "boiler room" operations to solicit AVGLOBAL products or services.

9. **Media Inquiries:** AVGLOBAL Members may not solicit coverage or publicity from the media regarding the AVGLOBAL business, nor may they appear on radio or television talk shows to promote their AVGLOBAL activities. If an AVGLOBAL Member is contacted by the Media (radio, television, the press, or other), the contact should be referred to the AVGLOBAL corporate office in order to maintain information accuracy and a consistent Company image.

**Member Responsibilities:**

All members are responsible for the following:

- Read our Frequently Asked Questions (FAQs).
- You must sign up with your own, unique e-mail address.
- You must sign up for your own Mastercard Debit Card, Solid Trust Account and ewallet Account.
- You must sign up with your own, unique IP address.
- You may not be sponsored by or receive 1st or 2nd-level referral commissions from anyone in your same household.
- In order to be an advertiser of AVGLOBAL, you must have your own product, program or opportunity to advertise or have access to a website for which you are an authorized reseller with the right to advertise.
- If you have problems viewing ads, you must submit a support ticket the SAME day you have the viewing problem.
- If your "Home Page" or "History" page is not reflecting the proper credit, dates, incentive payments or commissions, you must submit a support ticket the SAME day the problem occurred.
- You must know the time zone and the cut off time for viewing web sites. You have twenty-four (24) hours to view twenty-four (24) web sites. A day at AVGLOBAL begins at 12.01 am CST and ends at 12:00 a.m. CST.
- You MUST be courteous to our administration staff at all times, regardless of any problems you are experiencing.
- When making an advertising purchase with any payment processor be sure to follow the process all the way through so that the purchase is reflected on your AVGLOBAL account.
- You must be willing and able to receive emails from AVGLOBAL as a requirement of your membership.
- Be aware that if you use @hotmail, @yahoo, @BellSouth or @MSN addresses, you may not always receive our emails because of their SPAM systems. If this occurs, please use a different email address or check your bulk mails. We never have problems with @gmail.

**User-Supplied Content:**

AVGLOBAL services and materials may be used for lawful purposes only.

**Spam:**

If you are found to have spammed, without warning, AVGLOBAL reserves the right to disable or terminate your account immediately. All funds will be forfeited. AVGLOBAL may impose a penalty for each spam policy violation. AVGLOBAL also reserves the right to determine what violates this policy, in which case, any violation that occurs will result in account termination without refund of any monies.

**Refusal of Service:**

AVGLOBAL, at its sole discretion, reserves the right to refuse or cancel service to any Member or Advertiser. Violation of any polices, rules or regulations could result in a warning or possible account termination. Accounts may be terminated for any reason and without any prior notice to the Member or Advertiser. Accounts terminated due to policy violations will not be subject to refunds.

**Each Member who also chooses to be an Advertiser promoting on AVGLOBAL's web site must comply with the following rules:**

1. Websites advertised must not have any pop-up windows, pop-in windows, downloads, redirects, Trojans or malicious code.
2. Websites advertised must not be broken, under-construction, or slow-loading.
3. Websites advertised must not contain the following themes: pornography, matchmaking, mail order brides, religion, politics, goth, wicca, Satanism, war games and must not contain violent or inappropriate content. AVGLOBAL reserves the right to determine unacceptable themes.
4. Do not promote your advglobal.com replicated website on the AVGLOBAL rotator. Any sites submitted using AVGLOBAL's website will be deleted.
5. We do not allow Rotators or URL Trackers of any kind.
6. We will accept sites in any language, but your largest target market is English.

If you break any of the above rules, your account will be deleted without notice and all your funds will be forfeited.

**Waiver:**

In keeping with these terms, I, the Member/advertiser, furthermore release and forever discharge and hold harmless Advglobal, its heirs, successors and assigns and employees from any liability, claims and or demands of any kind or nature either in law or in equity, which arise or hereafter arise from my advertising purchases.

**Indemnification:**

The Member agrees that it will protect, indemnify, save and hold ADVGLOBAL harmless from any and all liabilities, losses, expenses and claims, as well as reasonable attorney's fees assessed against ADVGLOBAL, its agents, officers, employees and administration that may arise or result from any service provided or performed or agreed to by any product sold by its advertisers or customers, agents, employees or assigns. Member agrees to defend, indemnify and hold ADVGLOBAL harmless against liabilities arising out of, but not limited to, (1) any injury to person or property caused by any products sold or distributed by Member/advertiser and advertised on ADVGLOBAL website, (2) any material furnished by advertiser infringing or allegedly infringing on the rights of a third party, (3) copyright violation and any defective products sold to a customer from the ADVGLOBAL website.

### Cash Outs and Upgrades:

Cash outs are typically completed within forty-eight (48) hours after a cash out request. It may take up to 7 days to receive your money. It depends upon the method of cash out. There will not be any cash outs paid on Saturday, Sunday or Holidays. The minimum cash out is $10.00 and the minimum upgrade is $10.00.

If you do not pay a membership fee you can cash out only on Mondays but you must pay a cash out fee. There is a cash out fee if you do not pay a monthly membership fee. The fee depends upon your payment processor or the method of your cash out.

If you pay a monthly membership fee, ADVGLOBAL will not charge you a fee above the fee charged by your payment processor. If you pay a $10.00 per month membership fee, you can cash out your incentive payments every Monday without paying a fee to ADVGLOBAL over and above the fee charged by your payment processor.

If you pay a $25.00 per month membership fee, you can cash out your incentive payments every Monday, Wednesday and Friday without a fee from ADVGLOBAL. You will only pay the fee charged by your payment processor.

The same applies if you pay a $75.00 per month membership fee, you can cash out your incentive payments and referral commissions Monday through Friday and upgrade daily without a fee from ADVGLOBAL. You will only pay the fee from your payment processor.

You need to request cash outs from your account on ADVGLOBAL's website. You will be paid through payment processors or via ADVGLOBAL's International Mastercard Debit Card only.

ADVGLOBAL will select your method of cash out. You may request to be paid by a bank transfer through ewallet. When ADVGLOBAL request a bank transfer online, it usually takes 2 to 4 days to go through the banking system. It is not an instant transaction.

We reserve the right to assess fees as per our Fee Schedule. All fees are displayed and calculated in US Dollars.

You understand that you will need a valid e-mail address for communication purposes, and you agree to maintain the e-mail address provided on the release form attached to this agreement so long as you use the services of ADVGLOBAL. If you have a change in your e-mail address, you agree to notify ADVGLOBAL of these changes before further using the Service offered by ADVGLOBAL.

If you open an ADVGLOBAL account, you hereby consent to receive periodic newsletters and other types of e-mail communications from ADVGLOBAL, including customer service issues, new product offers and other matters. We reserve the right to e-mail you at any time regarding issues related to your account and your use of your ADVGLOBAL account.

You agree that all transactions involving your ADVGLOBAL account are final and not reversible, and you understand that there is no refund available after completing a transaction.

You agree that you are liable for any transactions made from your account, and you agree to indemnify, defend and hold harmless ADVGLOBAL for any transaction of whatsoever nature processed from your account.

You agree that you will not file a chargeback with your credit card company or bank account against ADVGLOBAL, and if you do file a chargeback, your account will be terminated and all funds in your ADVGLOBAL account will be forfeited and you will be banned from using the services of ADVGLOBAL in the future.

You acknowledge and accept that in the case of a claim of unauthorized transactions, the presumption shall be that all transactions are authorized by you and are your liability.

ADVGLOBAL agrees to not share your personal information with any third parties other than authoritative officials with authoritative rights. We will not surrender any of your information unless a court order and/or a Subpoena and/or a Protective Order is presented to us, and then we will abide by the laws of Uruguay and surrender your information only to the proper authorities who have the legal rights to said information. We view protection of Members and Advertisers' privacy as a very important principle. We store and process your personal information on computers that are protected by physical as well as technological security devices.

Nothing contained on www.advglobal.com should be understood as granting you a license to, but not limited to, use any of the trademarks, service marks, or logos owned by ADVGLOBAL or by any third party.

You must not divulge your password to anyone else, nor may you use anyone else's password. You agree that ADVGLOBAL will treat any person accessing your account using your password as you, and you understand and agree that any action taken by any person using your password shall be binding on you and all other parties involved in said action.

ADVGLOBAL is not responsible for any losses incurred by you as the result of the misuse of your password.

In order to use the service, you must register for an ADVGLOBAL account at www.advglobal.com. You may hold one ADVGLOBAL account, and this may be used for business or personal transactions. Our services are only available to individuals or businesses that can form legally binding contracts under applicable law.

If you are an international Advertiser, you warrant that you are violating no law or regulation in your jurisdiction or any other jurisdiction by advertising with ADVGLOBAL.

We are not an escrow service, and we make no guarantee of a product or service or the quality of a product or service you may receive from another Advertiser after purchasing it through www.advglobal.com account as we are not the person selling the product or service. If you have a complaint about the product or quality of the product, you agree to contact the Advertiser from whom you purchased the product or service and indemnify, defend and hold harmless ADVGLOBAL. We do not and cannot ensure the quality, safety, or legality of any merchandise received, or that will the seller even ship the merchandise.

We agree to initiate ACH (Automated Clearing House) transfers to and from your bank account only after you request the transaction through your ADVGLOBAL account, and we agree that the transaction will only be for the amount you request, less any applicable fees as found in our Fee Schedule on www.advglobal.com or additional standard transactional banking or other appropriate standard transactional fees.

WE AND OUR SUPPLIERS PROVIDE OUR SERVICES "AS IS" AND WITHOUT ANY WARRANTY OR CONDITION, EXPRESS, IMPLIED OR STATUTORY. WE AND OUR SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. COMPANY DOES NOT WARRANT THAT THE SITE OR THE SERVICE WILL MEET YOUR REQUIREMENTS OR THAT THE OPERATION OF THE SITE OR THE SERVICE WILL BE UNINTERRUPTED OR ERROR-FREE. THE INFORMATION AND SERVICES MAY CONTAIN BUGS, ERRORS, PROBLEMS OR OTHER LIMITATIONS. WE AND OUR AFFILIATED PARTIES HAVE NO LIABILITY WHATSOEVER FOR YOUR USE OF ANY INFORMATION OR SERVICE.

ADVGLOBAL shall make reasonable efforts to ensure that requests for all payments and cash outs are processed in a timely manner but we make no representations or warranties regarding the amount of time needed to complete processing because our service is largely dependent upon many factors outside of our control, such as delays in the banking system or mail system.

IN NO EVENT SHALL WE OR OUR SUPPLIERS BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH OUR WEB SITE, OUR SERVICE, OR THIS AGREEMENT (HOWEVER ARISING, INCLUDING NEGLIGENCE).

ADVGLOBAL will not be responsible for delays or failures in the transmission, receipt or execution of orders, payments, deliveries or information due to events beyond its control (acts of God). The obligations of this contract precede any government enactment.

We have the right to refuse service to particular individuals or entities, at our sole discretion, with or without cause.

We will suspend or re-activate an ADVGLOBAL account, if ordered to do so by an Order from a court or arbitration body of acceptable jurisdiction, as determined by ADVGLOBAL.

Solely to enable ADVGLOBAL to use the information with which you supply us, so that we are not violating any rights you might have in that information, you agree to grant us a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, sublicense (but no other rights) you have stored in your ADVGLOBAL account, in any media now known or not currently known, with respect to the information you have provided to ADVGLOBAL.

ADVGLOBAL and all related logos, products and services described in this website are either trademarks or registered trademarks of ADVGLOBAL, or its licensors, and (aside from the circumstances described below) may not be copied, imitated or used, in whole or in part, without the prior written permission of ADVGLOBAL. In addition, all page headers, custom graphics, button icons, and scripts are service marks, trademarks, and/or trade dress of ADVGLOBAL and may not be copied, imitated, or used, in whole or in part, without the prior written permission of ADVGLOBAL.

Notwithstanding the above, HTML logos or website payments features may be used without prior written consent for the purpose of directing web traffic to www.advglobal.com. These logos may not be altered, modified, or changed in any way, or used in a manner that is disparaging to ADVGLOBAL. Logos may not be displayed in any manner that implies sponsorship or endorsement by ADVGLOBAL. ADVGLOBAL is an advertising company, and no partnership, joint venture, employee-employer or franchiser-franchisee relationship is intended or created by this Agreement.

You agree that you will not use any device, software or routine to interfere with the proper working of the site or any activities conducted on our site. You agree that you will not take any action that imposes an unreasonable or disproportionately large load on our infrastructure. Much of the information on our site is proprietary or is licensed to ADVGLOBAL by our Advertisers or third parties.

You agree that you will not copy, reproduce, alter, modify, create derivative works, publicly display or frame any content (except for your personal information) from our web site without the prior expressed written permission of ADVGLOBAL or the appropriate third party. If you use, or attempt to use our website for purposes other than sending and receiving payments and managing your account, including but not limited to tampering, hacking, modifying or otherwise corrupting the security or functionality of our site, your account will be terminated, your available funds will be forfeited, and you will be subject to damages and other penalties.

You may close your account at any time by submitting a ticket using our support system on www.advglobal.com with the appropriate topic title: Close Account. Upon the termination of an account, any and all pending transactions will be cancelled and all unclaimed incentive payments and referral payments are forfeited. You will remain liable for all obligations related to your account even after such account is closed.

Without limiting other remedies, we may update inaccurate or incorrect information you provide to us, contact you by means other than electronically, immediately warn our community of your actions, place a hold on funds in your account, limit funding sources and payments, limit access to an account and any or all of the account's functions (including but not limited to the ability to send money or making withdrawals from an account), limit withdrawals, indefinitely suspend or close your account and refuse to provide our Services to you if:

You breach this Agreement or the documents it incorporates by reference.
We are unable to verify or authenticate any information you provide to us.
We believe that your actions may cause financial loss or legal liability for you, our Advertisers or us.
To secure your performance of this Agreement, you grant to ADVGLOBAL a lien on and security interest in your account.
You may not transfer any rights or obligations you may have under these Terms of Service without the prior written consent of ADVGLOBAL. ADVGLOBAL reserves the right to transfer these Terms of Service or any right or obligation under these Terms of Service without your consent.
You shall comply with all applicable U.S. and international laws, statutes, ordinances, regulations, contracts and applicable licenses regarding your use of our Services. ADVGLOBAL is

not responsible to establish your legal right to use our services. Such requirements rest entirely on the Advertiser. Earnings over $600 per year will be reported to the IRS for U.S. residents.

Any controversy or claim arising under or related to these Terms of Service shall be settled by arbitration in accordance with the International Arbitration Rules of the American Arbitration Association before a single arbitrator appointed by mutual consent of the parties to these Terms of Service. The language of the arbitration shall be English

These Terms of Service are governed by the laws of Uruguay except that Louisiana Advertisers may choose Louisiana law.

In the event that any provisions of these Terms of Service shall be determined by an arbitration body or a court of competent jurisdiction to be unenforceable in any jurisdictions, such provision shall be unenforceable in that jurisdiction and the remainder of these Terms of Service shall remain binding upon the parties as if such provisions were not contained therein. The enforceability of such provision shall otherwise be unaffected and remain enforceable in all other jurisdictions.

You agree that this Agreement and all incorporated agreements may be automatically assigned by ADVGLOBAL, in our sole discretion, to a third party in the event of a merger or acquisition. Our failure to act with respect to a breach by you or others does not waive our right to act with respect to subsequent or similar breaches. These Terms of Service set forth the entire understanding between us with respect to the subject matter hereof.

The Services are offered by AdView Global located currently at 200 Zonamerica, Uruguay.

Disputes between you and ADVGLOBAL regarding our Services may be reported to Customer Support using our online ticket system at any time.

If you do not abide by these Terms of Service, ADVGLOBAL has the option to terminate your account immediately.

ADVGLOBAL reserves the right to change the Terms of Service on this site and Agreement at any time.

ADVGLOBAL