## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number: 10 CR 320 (RMC)** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 1343 (Wire Fraud)** |
| **THOMAS ANDERSON BOWDOIN, JR.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

### Introduction

Thomas Anderson Bowdoin's life story reads like a handbook on fraud and deception. Bowdoin has spent the past several decades lying to investors and cheating unsuspecting victims out of over $120 million through various schemes to defraud and bogus companies. He has used his wit and charm to convince people to give him their hard earned money; sometimes their last pennies. He prayed on people's religious beliefs, convincing them that it was "God's will" that they give him their money. He took advantage of the hard economic times of the past five years, assuring people that his business model provided an easy way out of their financial predicaments. All of this was done for one purpose: to line his own pockets. He had no concern for the lives he affected or destroyed, and he boldly continued or expanded his criminal conduct even while under the supervision of this Court.

Given the egregious nature of Bowdoin's criminal conduct in carrying out the ASD scheme, as well as his criminal history and other criminal conduct discussed herein, the government recommends that the Court sentence Bowdoin to the maximum period of incarceration allowed under the plea agreement: 78 months.

I.    Bowdoin's Criminal History By Decade

      A.    1990s

In the early 1990s, Bowdoin promoted and sold securities in a mobile phone company, All American Communications Network, Inc. ("All American").   During the course of his promotion, Bowdoin made numerous false and misleading statements, including claiming among other things that: 1) investors' money was going to be used to install a mobile phone system in Atlanta, Georgia; 2) All American possessed technology that allowed it to service an unlimited number of customers; and 3) the State of Georgia had issued the requisite licenses for All American to operate its mobile phone business.   According to Alabama officials, all of these claims were false or misleading.   To further his scheme, Bowdoin solicited funds from investors residing in Alabama, but Bowdoin failed to register the securities in Alabama and failed to register as a securities agent in Alabama.

Alabama authorities investigated Bowdoin and charged him in three different Alabama counties with securities fraud, sale of unregistered securities and failing to register as a securities agent.   More specifically, Bowdoin was charged in Montgomery County, Alabama with:

        1.      Five counts of failing to register as an agent selling
                securities in case 96-CC-1142;

        2.      Five counts of selling unregistered securities in case 96-
                CC-1143; and

2

3. Forty three counts of making various false statements in the sale of securities in case 96-CC-1144.

Copies of the Montgomery County, Alabama indictments are attached hereto as Exhibit A.

Bowdoin was also charged in Wilcox County, Alabama in case number 97-CC-16 with one count of failing to register as a securities agent, one count of selling unregistered securities and two counts of making a false statement in the sale of securities. A copy of the Wilcox County, Alabama indictment is attached hereto as Exhibit B. Bowdoin was also charged in Jefferson County, Alabama in 11 separate one count indictments with:

1. Selling unregistered securities in cases 96-CC-6215, 96-CC-6216, 96-CC-6218, 96-CC-6221 and 96-CC-6225;

2. Making false statements in the sale of securities in cases 96-CC-6217, 96-CC-6220, 96-CC-6224 and 96-CC-6466; and

3. Failing to register as a securities agent in cases 96-CC-6219, 96-CC-6222 and 96-CC-6223.

Copies of the Jefferson County, Alabama indictments are attached hereto as Exhibit C.

In 1997, Bowdoin pleaded guilty to the following two felony counts in two of the Montgomery County, Alabama indictments in exchange for dismissal of the remaining counts in those indictments and the Jefferson County indictments:

1. Count 1 in case 96-CC-1143, failing to register a security in violation of the Alabama Securities Act § 8-6-4; and

2. Count 1 in case 96-CC-1144, making an untrue statement of material fact in the sale of a security in violation of the Alabama Securities Act § 8-6-4.

A copy of the plea agreement is attached hereto as Exhibit D.

3

In addition, as part of the plea agreement, Bowdoin was permanently barred from engaging in the securities industry in the State of Alabama. Due to a subsequent guilty plea in Wilcox County, Alabama to one count of securities fraud in case 97-CC-75, the defendant was sentenced to a term of probation in connection with the Montgomery County, Alabama cases and a term of 10 years in prison in connection with the Wilcox County, Alabama case. A copy of the Wilcox County plea agreement and sentencing order are attached hereto as Exhibit E. There also appears to have been additional concessions made by the Alabama government in the Wilcox County plea agreement that may have reduced the Wilcox County charge to a misdemeanor, but it is unclear from Alabama records whether those concessions were ever granted or whether Bowdoin ever served any time in prison for any of his Alabama offenses.

B.      2000s

This decade was dominated by the illegal conduct charged in the instant indictment. Given the Court's familiarity with the facts underlying the ASD case, this memorandum will focus on the essential facts relating to the fraud. Bowdoin's key misrepresentation to ASD investors was the promised opportunity to earn 125% on their investment. For example, Bowdoin promised to return $1,250 to every investor who purchased $1,000 worth of advertising on ASD's website. The reality was that while a small percentage of initial investors may have had the ability to earn 125% on their investment, that promised opportunity was entirely illusory for the vast majority of investors because there was no independent revenue to fund the additional pay outs. Stated differently, because the promised returns were entirely contingent on an ever increasing number of new investors contributing more and more money to the program, once the influx of new investors slowed and/or stopped, ASD had no money to fund the

4

additional pay outs. This business model --whether operated for one month, one year or longer --
was destined to collapse and fail, leaving the vast majority of investors with nothing.

Of course, Bowdoin never disclosed this fatal flaw to any ASD investors.  Instead,
Bowdoin claimed over and over again that ASD was a sustainable revenue generating business.
Compounding these lies, Bowdoin repeatedly told investors through ASD employees that he
could be trusted with their money because he had no contact with the criminal justice system
aside from a minor traffic violation. This representation was similarly false and misleading given
his extensive criminal history in Alabama.

During the first year of ASD's operation, Bowdoin was mildly successful in convincing
people to invest in his business.  However, in early 2008, Bowdoin enlisted the help of a
marketing agent to poll ASD members to learn their concerns.  Universally, ASD members and
potential members stated that they were concerned that ASD was illegal and a Ponzi scheme.  To
allay these concerns, Bowdoin enlisted a lawyer who was also an ASD member to join him in a
videotaped presentation to ASD members which was posted on the ASD website.  In the video,
the lawyer assured investors that ASD's business model was legal and not a Ponzi scheme.
These assurances along with increased marketing and several ASD rallies that were held
throughout the country where Bowdoin offered to match any investment in ASD caused ASD's
profits to skyrocket.  In a matter of months, investors poured tens of millions of dollars into
ASD.

Fortunately for the investing public, ASD's popularity in the spring and summer of 2008
also drew the attention of the United States Secret Service ("Secret Service"), which investigated
Bowdoin and ASD and discovered the true nature of the business model.  The Secret Service

obtained seizure warrants from this Court and seized a large portion of ASD's improperly obtained revenue. Bowdoin challenged the civil forfeiture in this Court, claiming that the government had acted improperly in seizing ASD's assets. Bowdoin also claimed throughout the civil litigation that he acted on the advice of counsel and, therefore, did not do anything wrong or illegal. Bowdoin's reliance on the "advice of counsel" defense became a theme in both the civil and criminal litigation.

Despite the pending civil case and government allegation that ASD was simply a giant Ponzi-scheme based entirely on lies and deception, Bowdoin and one of his ASD associates launched yet another Ponzi scheme under the corporate name Ad View Global ("AVG") that was simply a repackaged version of ASD. Bowdoin employed the same deceptive and misleading tactics, offering extraordinary rates of return despite the lack of any independent revenue to support the business model. At times, Bowdoin has denied any involvement in AVG, but documents discovered by the government undermine that contention. Specifically, Bowdoin drafted a memo summarizing AVG's history, business and corporate structure, including the fact that Bowdoin owned two thirds of AVG's business. A copy of the memo is attached hereto as Exhibit F. The government also obtained several emails between Bowdoin (using the email address andybo@hushmail.com) and his AVG co-conspirators discussing AVG's structure, marketing and business. Copies of those emails are attached hereto as Exhibit G. Despite Bowdoin's efforts, AVG's business was abandoned later in 2009 when allegations arose that one of Bowdoin's co-conspirators stole money from AVG's business.

6

C.     2011-2012

Bowdoin was indicted in the instant case in 2010.  As the Court knows, the indictment alleged, among other things, that Bowdoin operated an illegal, massive on-line Ponzi scheme to the detriment of more than 96,000 investors.  Early in the case, the Court ruled that Bowdoin could remain on his personal recognizance with limited conditions.  Bowdoin blatantly disregarded those conditions by engaging in yet another on-line Ponzi scheme under the business name OneX.  While OneX's purported business (the sale of lessons on "how to" build a home based business) was different than ASD's purported business (advertising on the internet), the fundamentals were the same.  Both businesses were promoted over the internet and were entirely dependent on an ever-expanding number of investors contributing greater and greater amounts of money to survive.

The key to OneX, similar to ASD, was the promise of extraordinary rates of return. Bowdoin claimed that investors would earn over $99,000 by following the OneX model, and could earn up to $9 million in just 13 weeks.  Not surprisingly, the lure of fast, easy money induced countless numbers of investors to give their hard earned money to Bowdoin. Exacerbating the fraud was Bowdoin's failure to disclose his prior criminal history from Alabama and detail the full extent of the charges he faced as a result of the ASD indictment.

In spring 2012, the government issued its Fed. R. Evid. 404(b) notice to Bowdoin, informing him that the government intended to introduce evidence relating to OneX at his trial in September 2012.  In response, Bowdoin once again claimed that he did nothing wrong because he acted on the "advice of counsel."  During a hearing before this Court, Bowdoin's "advice of counsel" claim was explored.  Importantly, it became clear that Bowdoin did not speak to a

lawyer about OneX, but merely relied on another OneX promoter who had supposedly spoken to

a lawyer.  Further undermining Bowdoin's advice of counsel claim was an affidavit sworn to by

the lawyer who was consulted by OneX management.  In the affidavit, the lawyer made clear that

he never advised anyone that the OneX business model was legal.  Rather, the lawyer stated that

he advised OneX management on how to make the business legal, but did not review the actual

business practices of OneX or ensure compliance with his legal recommendations.  A copy of the

affidavit is attached hereto as Exhibit H.  Simply put, Bowdoin's "advice of counsel" claim was

just another red herring designed to cover up and minimize his illegal conduct.

II.    CONCLUSION

For decades, Bowdoin spent his life taking advantage of others, used his talent to separate people from their hard earned money, and prayed upon some of society's most vulnerable victims, senior citizens.  He has used his cunning and skill to dupe investors to the tune of more than $120 million.  He has violated Court orders and repeatedly offered wholly unsupportable claims that he reasonably relied on the advice of lawyers.  At virtually every turn, Bowdoin has manipulated investors, the business community and the legal system to the detriment of thousands and thousands of victims.  All to serve his own ends:  personal wealth.  While the government is sensitive to Bowdoin's age, his criminal endeavors must be punished and the investing public must be protected from the possibility that Bowdoin could return to what appears to be the only way he knows how to operate: through fraud and deception.  As such, the government submits that a just and appropriate sentence in this case is the maximum period of incarceration permitted under the plea agreement - - 78 months.

Seth B. Waxman
Assistant United States Attorney

9